**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **TEXAS ENTERTAINMENT** | § | |
| **ASSOCIATION, INC.,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 1:17-cv-594-DAE** |
| | § | |
| **GLENN HEGAR, COMPTROLLER OF** | § | |
| **PUBLIC ACCOUNTS OF THE STATE** | § | |
| **OF TEXAS,** | § | |
| | § | |
| *Defendant.* | § | |

**PLAINTIFF'S CLOSING BRIEF**

Plaintiff Texas Entertainment Association, Inc. ("TEA") submits this Closing Brief in the above-captioned matter and would show the Court as follows:

**INTRODUCTION AND LEGISLATIVE BACKGROUND**

In 2007, the Texas Legislature introduced a new "fee on certain sexually oriented businesses." Imposition and Use of a Fee on Certain Sexually Oriented Businesses and Certain Programs for the Prevention of Sexual Assault, R.S., ch. 1206, 2007 Tex. Sess. Law Serv. Ch. 1206 (H.B. 1751). Effective January 1, 2008, it is currently recorded in Texas Business & Commerce Code §§ 102.051—102.056 (the "$5 Fee Statute"). The fee imposed on "Sexually Oriented Businesses" ("SOB") as defined in Business & Commerce Code § 102.051 and the meaning of that phrase is the basis of this dispute. Whether or not a dancer is "clothed" determines whether an establishment is a Sexually Oriented Business subject to the fee. *See* Tex. Bus. & Com. Code § 102.051.

Almost uniformly across Texas, businesses that opted to cease featuring nude entertainment following enactment of the $5 Fee Statute began to require female dancers to wear

opaque latex clothing over their breasts (the "Latex Clubs"). From January 1, 2008 until October 28, 2016, when the Comptroller published the Amended Rule as a proposed rule in the Texas Register, the Comptroller for the first time adopted a policy that Latex Clubs' provided "nude" entertainment and therefore were Sexually Oriented Businesses within the meaning of the $5 Fee Statute. (*See* Plaintiff's Exhibit 1; Trial Transcript Vol II, 37:16-38:13 (in "late 2016," the Comptroller's enforcement officers were still telling club managers that latex qualified as clothing under the $5 Fee Statute)).

Effective January 29, 2017, the Comptroller amended its rules construing the term "Sexually Oriented Business" within the meaning of the $5 Fee Statute (the "Amended Rule"). *See* 42 TEX. REG. 219, *amending* 34 TEX. ADMIN. CODE § 3.722. Section 3.722(a)(1) of the Amended Rule states: "Paint, **latex**, wax, gel, foam, film, coatings, and other substances applied to the body in a liquid or semi-liquid state are **not clothing**." (emphasis added). This portion of the Amended Rule purports to create restrictions on the type of covering a person may wear and would for the first time allow the $5 Fee Statute to apply to a female entertainer whose breasts are fully covered.

On June 19, 2017, the TEA filed this lawsuit, challenging the Amended Rule as violating the Due Process clause of the Federal Constitution, as well as the First Amendment, Equal Protection, and that the Amended Rule is independently unconstitutionally vague. (Dkt. No. 1, pp. 4-10). The Comptroller moved to dismiss the TEA's claims for lack of standing to challenge the Amended Rule, which the Court granted with respect to the TEA's claim for money damages, but denied with respect to its request for declaratory and injunctive relief. (*See* Dkt. No. 26, pp. 2-3). On February 27, 2019, the Court granted the TEA declaratory relief on summary judgment pursuant to 42 U.S.C. § 1983 on its First Amendment and Due Process challenges, and found

triable issues of fact with respect to its Equal Protection, Overbreadth, and the issue of notice for its Due Process Claim. [1] (Dkt. No. 50, pp. 25-31, 35-37). After presentation of evidence at a two-day bench trial, Plaintiff proved its case through compelling and unrebutted evidence as to all three remaining issues:

**Due Process**. The undisputed evidence shows that the Comptroller first gave Latex Clubs notice that the $5 Fee Statute would be applied to them on October 28, 2016, when the Comptroller first published notice that his office would interpret the word "clothing" to exclude a variety of materials. 34 TEX. ADMIN. CODE § 3.722 ("Amended Rule"); (Exhibit 1).

**Overbreadth**. Far from promoting the statute's express and adjudicated purpose – combating negative secondary effects of combining nudity with alcohol – the Comptroller provides no basis other than the Preamble of the Amended Rule for bringing Latex Clubs within the scope of the $5 Fee Statute. *See Combs v. Texas Entm't Ass'n, Inc.*, 347 S.W.3d 277, 287–88 (Tex. 2011) (articulating the secondary effects basis for the original $5 Fee Statute). The Amended Rule neither furthers an important government interest, nor is it tailored in scope to further that interest. *See Board of Trustees of the State Univ. of New York v. Fox*, 492 U.S. 469, 478 (1989) ("to be 'narrowly tailored' … we have not insisted there be no conceivable alternative, but only that the regulation not burden substantially more speech than is necessary to further the government's legitimate interest.")).

**Equal Protection**. The Comptroller, without providing any basis, fails to enforce the $5 Fee Statute against businesses other than cabarets and Latex Clubs that similarly fall within the Amended Rule's definition of nudity. This type of targeted enforcement cannot survive even

---

[1] The Court granted summary judgment in favor of the Comptroller on the TEA's vagueness claim, but indicated at trial that it might reconsider that order in light of the evidence. (Trial Transcript Vol. II, 55:6-21). The TEA urges the Court to do so in Section III, below.

rational basis scrutiny. *Wood v. Collier*, 836 F.3d 534, 539 (5th Cir. 2016). However, because the fundamental right of free speech is implicated by the Amended Rule, the Comptroller must sustain strict scrutiny. Its regulation in the form of the Amended Rule cannot, and the Court should enter the declaratory and injunctive relief sought by the TEA.

## UNDISPUTED FACTS AT TRIAL

The Comptroller presented no evidence articulating the basis of the Amended Rule outside of its text or Preamble, or to rebut the TEA's evidence that it engaged in discriminatory enforcement practices, targeting cabarets[2] and with the Amended Rule, now Latex Clubs. In fact, the Comptroller's representatives repeatedly and unequivocally demonstrated that the Amended Rule was a new policy sought to be applied retroactively without warning, that its application to Latex Clubs is divorced from the $5 Fee Statute's purpose, and that the very purpose of the Amended Rule was to target Latex Clubs.

Ray Langenberg, Special Counsel for the Tax Division of the Comptroller's office, testified that he assisted the Comptroller's office in drafting the Amended Rule and participated in the crafting of the definition of "clothing." (Trial Transcript Vol. I, 52:15; 59:15-17). Despite standing in a unique position to explain to the Court the purpose and objectives of the Amended Rule, his testimony was limited to repeated statements that the purpose for the Amended Rule is entirely contained within the Amended Rule's Preamble. (Trial Transcript, Vol. I, 90:9-23). As the Court observed, there is "zero question at all that the purpose of [the Amended Rule] was to bring latex clubs within the ambit of the [$5 Fee Statute]." (Trial Transcript, Vol II, 17:22-18:3). The Comptroller offered no evidence to rebut the Amended Rule's clear and apparent purpose. Rather,

---

[2] The term 'cabaret' was defined by agreement with several witnesses to describe a nightclub featuring expressive dance on a stage and the term is used consistently with that understanding throughout this Brief. (*See* Trial Transcript Vol. I, 50:8-52:9 (Mr. Langenberg); 125:11-126:7 (Ms. Williams), Vol. II, 32:12-16, 34:7-14 (Mr. Craft).

when questioned on the issue, Mr. Langenberg hid behind attorney client and deliberative process privilege. Vol I, 90:9-91:7. When put on notice that Plaintiff planned to use his assertion of privilege as the basis for the Court making an adverse inference, Mr. Langenberg doubled-down and refused to waive the Comptroller's privilege assertion. (Trial Transcript Vol. I, 91:8-21).

On top of lacking a governmental purpose for extending the $5 Fee Statute to Latex Clubs featuring female entertainers with fully covered breast, the Comptroller sought to assess the fee against Latex Clubs for time periods before the Amended Rule even existed. Cindy Williams, a former Comptroller auditor with the Business Activities Research Team, could provide no testimony to suggest that the Comptroller even half-heartedly attempted to give notice to Latex Clubs of the Comptroller's change in policy and intent to assess the $5 Fee against them. Between 2013 and August 2016, Ms. Williams issued sexually oriented business fee assessments with the Business Activity Research Team ("BART"). (Trial Transcript Vol.1 105:7-16). She confirmed that during her time as an auditor, before the Amended Rule went into effect, she took the position that "clothing" cannot be made out of latex. (Trial Transcript Vol I, 114:14-24). However, Ms. Williams was not aware of and could not point to any written guidelines from the Comptroller which businesses against whom the $5 Fee was assessed or even the Comptroller's own internal auditors could rely upon. (Trial Transcript Vol. I, 115:12-20). Nor did Ms. Williams or anyone at the Comptroller's office, to the best of her recollection, ever provide notice of this interpretation of the $5 Fee Statute to any businesses affected by it. (Trial Transcript Vol I, 120:1-12). In fact, the Comptroller has no evidence it provided notice to affected businesses whatsoever prior to adopting the Amended Rule.

Paul Zavala, a Comptroller enforcement officer, also testified that he was responsible for enforcing the $5 Fee against sexually oriented businesses in the State of Texas. (Trial Transcript

Vol. I, 124:10-25). Mr. Zavala was responsible for applying the language of the $5 Fee Statute to determine whether, based on his inspections, adult cabarets qualified as "sexually oriented businesses." (Trial Transcript Vol. I, 126:9-12). He testified that he determined a business featured "nude" entertainment, and assessed the $5 Fee, if entertainers had less than three quarters of their buttocks covered. (Trial Transcript Vol. I, 132:8-22). However, no one at the Comptroller's office made that guideline for him. (Trial Transcript Vol. I, 133:5-10). He also testified in a previous deposition—in a case regarding the $5 Fee Statute's application to Latex Clubs—that prior to adoption of the Amended Rule, the Comptroller policy treated latex as 'covering.' (Trial Transcript Vol. I, 134:7-20). When questioned at this trial, he recharacterized his testimony in tortured fashion to draw a distinction between 'covering' and 'clothing' in order to assert that the Comptroller's policy did not acknowledge latex as clothing prior to the adoption of the Amended Rule. (Trial Transcript Vol. I, 134:21-135:6). All Mr. Zavala's testimony proves is that the Comptroller enforced the $5 Fee Statute against cabarets in an arbitrary and capricious manner.

Finally, Plaintiff presented Steve Craft, the Texas Entertainment Association's corporate representative and independently, the officer of many gentlemen's clubs or adult cabarets in various markets throughout the State of Texas. Trial Transcript Vol. II, 32:3-17, 33:16-23. Out of all four witnesses who testified, only Mr. Craft had personal knowledge of the nature of dancer clothing at Latex Clubs:

> Q. Are you familiar with latex that is worn at gentlemen's clubs throughout the state of Texas? A. Yes, I am. Q. All right. Can you please tell the Court what latex is, where it comes from, and how it's applied to a dancer at a cabaret? A. Sure. Latex, in its raw form, is a milky liquid substance. All latex comes from a latex plant, latex tree. From that point, it can be bottled, typically ammonia's put in it to keep it from solidifying. There is ammonia-free latex that they will put some other type substance in to keep it from hardening or solidifying at that point. So it stays in the bottle. They can take it and spread it out in sheets, tint it to whatever color they want. When they put it out in sheets, they would cut it and make into a -- cut a pattern out. As far as a liquid latex, when it's applied to someone, it's not painted

on. It's done with sponges. There's four coats put on. Four coats would be equivalent to a surgical glove. In fact, if you took your hand and stuck it in latex, pulled it out, let it dry, suck it back, did that four times, you would have the equivalent of latex gloves, surgical gloves that you could peel off. It's applied to the breast. It's applied with sponges. You put four coats on, letting each coat dry. Sometimes the girls use hair dryers. But it takes three or four minutes to dry. You cannot see through it at all. Latex -- there is no clear latex. It's white, thick, milky when it comes out. So even raw form, you can't see through it.

(Trial Transcript Vol. II, 34:22-35:24). Latex covering is opaque, thick as a glove, and it's even

removed in one piece, like a decal:

[A]: The only way to get it off is peeled off. It doesn't flake off, and it's not going to peel off on its own. You're going to have to tug it and peel it off. So that's kind of. THE COURT: Does it peel off in one -- essentially one contiguous -- it bonds together, so if you can even start it, say, at the side, you could -- you would peel it off like you would peel off a decal, for instance. THE WITNESS: Exactly. And just like on a decal, sometimes you're peeling off the decal and you pull the wrong way and it tears, well, it will tear off in strips. But if you pull it -- just correct pressure and just pull, yes, it will peel off just like a solid decal. And you will have the latex -- now, when it comes off, it's going to shrink up because when it goes on, adheres to the body, it tightens up. So it's going to shrink up, and it would be difficult to put back on in that same manner as when you first applied it.

(Trial Transcript Vol. II, 36:7-25). In fact, unlike a traditional cloth bikini top, there is no risk of a

"nipple slip":

THE COURT: What happens when you have a young woman in your club who is allergic to latex that says, I can't wear it? Is she just not working in your club? THE WITNESS: She could wear a bikini. The problem with the bikini -- the reason we went with latex is on the bikini, a girl could move. She could be dancing, it could slip. We had a nipple slip on the Superbowl with Janet Jackson. THE COURT: Certainly right. THE WITNESS: This can't slip. This is not going anywhere. It would be forceful to take it off, peel it off. So a girl couldn't, if she wanted to, flash. I mean, they're independent contractors. They're there to make money. She couldn't flash. It couldn't slip, it couldn't get hung on something.

(Trial Transcript Vol. II, 40:16-41:5). When entertainers at Latex Clubs perform, you cannot see

the sides of their breast, you cannot see below the top of the areola to the bottom of the breast, and

the entirety of the breast is completely covered. (Trial Transcript Vol. II, 43:4-11). They wear 'boy

shorts' which completely cover their buttocks. (Trial Transcript Vol. II, 43:12-20). The

entertainers are not "nude" within the meaning of the $5 Fee Statute. *See* TEX. BUS. & COM. CODE § 102.051(1)(b). They are only "nude" within the meaning of the Amended Rule, which was passed for the express purpose of bringing them within the scope of the $5 Fee Statute.

Additionally, based on his decades of experience working in the adult cabaret industry as an operator of both latex and non-latex cabarets, communications with other business proprietors, and his review of scores of administrative decisions, Mr. Craft testified that he has never heard of the Comptroller enforcing the statute against businesses other than cabarets. (Trial Transcript, Vol II, 77:12-78:5).

Importantly, Plaintiff also provided evidence that a myriad of businesses qualify as a Sexually Oriented Business under the terms of the $5 Fee Statute, including:

> A concert featuring Beyonce Knowles at NRG Stadium in Houston, Texas (Plaintiff's Exhibit 8; Trial Transcript Vol. II, 44:2-17).

> A performance at Warehouse Live in Houston featuring the Suicide Girls (Plaintiff's Exhibits 9 and 10; Trial Transcript Vol. II, 45:18-48:5).

> Waitress entertainers at Tight Ends[3] (League City and Plano, Texas), Redneck Heaven (Arlington, Fort Worth, and Lewisville, Texas), Twin Peaks (Houston, Texas), Wild Pitch Sports Bar (Frisco and Fort Worth, Texas), Knockout Sports Bar (Dallas, Texas), Tilted Kilt (Killeen, Laredo, McAllen, Midland, and San Antonio, Texas), Chulas (Houston, Texas), Ojos Locos (Dallas, Houston, San Antonio, and El Paso, Texas) (Plaintiff's Exhibit 12).

> A concert featuring Jennifer Lopez and other entertainers at Toyota Center in Houston, Texas. (Plaintiff's Exhibit 14).

According to its plain language, the Amended Rule would also apply to mainstream performances at the Majestic Theater in San Antonio, *e.g.*, "Erika Moon's Cabaret Follies," a burlesque exhibition that features female performers in various states of undress.[4]

---

[3] (*See also* Plaintiff's Exhibit 12).

[4] http://www.majesticempire.com/mobile/calendar/erikamooncabaretfollies2019 (last accessed November 26, 2019); http://www.erikamoon.com/gallery/ (last accessed November 26, 2019).

Mr. Craft testified that he visited many of the above establishments and had personal knowledge that the waitresses both provided entertainment and the businesses were Sexually Oriented Businesses within the meaning of the $5 Fee Statute. (*See* Trial Transcript, Vol. II, 64:14-72:9 (Mr. Craft visited many of these clubs, the waitresses were "nude," they were providing entertainment, and alcohol was being served)). Furthermore, Plaintiff's Exhibit 11 was admitted into evidence as proof that businesses held themselves out as featuring waitresses who are "nude" within the meaning of the $5 Fee Statute. (Trial Transcript, Vol. II, 48:18-49:18). This is sufficient to create a presumption, according to the Comptroller, that those businesses in fact feature nude entertainment. TEX. ADMIN. CODE. § 3.722 (d)(2).[5]

The Comptroller presented no evidence that it ever enforced or attempted to enforce the $5 Fee Statute against any of these businesses. However, the Comptroller did enact the Amended Rule to target adult cabarets featuring entertainers clad in latex. By doing so, it enacted a content-based discriminatory policy in violation of the First Amendment, as the Court held in its partial Summary Judgment Order. (Dkt. No. 50, pp. 18-25). It also created an unofficial policy to pass on enforcing the $5 Fee Statute against Latex Clubs until it announced the Amended Rule on October 28, 2016, and then attempted to retroactively apply the Amended Rule to Latex Clubs in violation of due process. (*See* Dkt. No. 50, pp. 35-37). Lastly, by passing the Amended Rule, the Comptroller engaged in discriminatory action against the fundamental right of expression, subjecting it to strict scrutiny.[6] *See Ctr. for Inquiry, Inc. v. Warren*, 3:18-CV-2943-B, 2019 WL 3859310, at *13 (N.D. Tex. Aug. 16, 2019) (secular group stated a claim of equal protection as to challenging a marriage

---

[5] The Comptroller is judicially estopped from even arguing that this evidence is insufficient to prove that the businesses feature nudity. *See In re Superior Crewboats, Inc.*, 374 F.3d 330, 334 (5th Cir. 2004).

[6] However, the Comptroller did not even produce a purpose behind the Amended Rule that would survive even a rational basis review should the Court determine that a fundamental right is not at issue. *See Wood v. Collier*, 836 F.3d 534, 539 (5th Cir. 2016).

statute that only allowed religious leaders and certain governmental officials to solemnize a marriage) (citing *Wood v. Collier* 835 F.3d 534, 539 (5th Cir. 2016)). The Amended Rule should be declared unconstitutional, and the Comptroller should be enjoined from enforcing it.

## ARGUMENT AND AUTHORITIES

The TEA presented compelling evidence in support of each of its claims while the Comptroller, in contrast, presented no evidence to rebut any of the TEA's positions. The Fifth Circuit reviews the trial court's factual findings after a bench trial for clear error and gives the trial court wide discretion in fact-finding. *S.T.S. Int'l, Ltd. v. Laurel Sea Transp., Ltd.*, 932 F.2d 437, 440 (5th Cir. 1991); *In re Mid–South Towing Co.*, 418 F.3d 526, 531 (5th Cir. 2005). However, where there is no evidence to support a claim or defense, as is the case with the Comptroller's purported challenges to the TEA's causes of action, judgment is appropriate as a matter of law. A motion for judgment as a matter of law should be granted if "there is no legally sufficient evidentiary basis for a [fact finder] to find for a party." *Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483, 486 (5th Cir. 2004) (citing FED. R. CIV. P. 50(a)). With the Court's benefit of an evidentiary record, and the Comptroller's failure to present evidence to rebut the TEA's theories or even put on a case-in-chief, there is no question that the TEA is entitled to judgment on each of its claims.

I.   **Enforcement of the $5 Fee Statute against Latex Clubs violates due process because the Comptroller did not provide notice that it would construe the $5 Fee Statute to apply to them until October 28, 2016 when it published the Amended Rule in the Texas Register.**

The first time that the Comptroller gave notice to businesses that its office did not consider latex-clad performers to be "clothed" was in the October 28, 2016 edition of the Texas Register. (Plaintiff's Exhibit 1). In that entry, the Comptroller proposed to "include a definition of clothing that conforms to the commonly understood meaning of the term [and] to memorialize the

comptroller's existing interpretation of what constitutes clothing…." 41 TEX. REG. 8341, 8511-13. Prior to its publication, the Comptroller's restrictive interpretation of "clothing" was not even memorialized or adopted as an official policy within the Comptroller's own office. Ms. Williams explained that she could not recall having prepared or received any written procedures regarding what qualifies as "clothing" from the Comptroller. (Trial Transcript, Vol I, 115:12-20). Nor could she recall sending any letters about the expanded definition of "clothing" to any businesses. (Trial Transcript Vol I, 120:1-12). Instead, without informing the Latex Clubs that the Comptroller now considered them fair game, Ms. Williams simply went about issuing millions of dollars in assessments to businesses throughout the State of Texas. The Comptroller presented no controverting evidence to suggest any of the Latex Clubs received notice prior to the publication date of the Amended Rule.

Mr. Craft, the TEA's representative and an officer of many Latex Clubs, certainly never received such notice. He explained that prior to 2017, none of the Comptroller officers who visited the latex clubs he oversaw told him that performers wearing latex qualified as "nude" under the statute. (Trial Transcript Vol II, 37:16-38:13). In fact, Mr. Craft testified that in late 2016, Comptroller officials visited a latex club and told him that "everything looks good," *i.e.*, performers whose breasts were covered in latex were not considered "nude." *Id.*

As the Court noted, to determine whether application of the Amended Rule prior to notice of it being given on October 28, 2016 is "so harsh and oppressive" as to violate due process, courts consider "whether, without notice, a statute gives a different and more oppressive legal effect to conduct undertaken before enactment of the statute." (Dkt. No. 50, p. 31 (quoting *United States v. Hemme*, 476 U.S. 558, 568-69 (1986))). Such a retroactive application does indeed violate due

process, and the Court should enjoin enforcement of the Amended Rule for dates prior to October 28, 2016, when the Latex Clubs were put on notice. (*See* Dkt. No. 50, p. 37).

II.     **The Amended Rule's application to Latex Clubs bears no relation to the $5 Fee Statute's or the Amended Rule's purpose and is therefore unconstitutionally overbroad speech regulation.**

As this Court held, the Amended Rule cannot satisfy either strict or intermediate scrutiny because it is a content-based or subject matter-based regulation of constitutionally protected speech. (Dkt. No. 50, pp. 18-25). The Amended Rule is also an overbroad speech regulation. The overbreadth doctrine "permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.'" *City of Chicago v. Morales,* 527 U.S. 41, 52 (1999) (citing *Broadrick v. Oklahoma,* 413 U.S. 601, 612-615 (1973)). That means the challenged law's application, under the lesser intermediate scrutiny standard, must further an important government interest and do so by means that are substantially related to that interest. *See Am. Library Ass'n v. Reno*, 33 F.3d 78, 88 (D.C. Cir. 1994) (quoting *Board of Trustees of the State Univ. of New York v. Fox*, 492 U.S. 469, 478 (1989) ("to be 'narrowly tailored' … we have not insisted there be no conceivable alternative, but only that the regulation not burden substantially more speech than is necessary to further the government's legitimate interest.")). Assuming, only for purposes of evaluating the TEA's overbreadth claim, that the Amended Rule had a 'plainly legitimate sweep' in the first instance, its application to Latex Clubs falls far outside of it, making it an 'impermissible application' well beyond the Amended Rule's purpose.

The Amended Rule is not tied to an important, let alone compelling government interest. As stated by its legislative history, the legislature promulgated the $5 Fee statute to impose a fee on what it deemed "inessential and entirely discretionary behavior to fund important services to

victims of sexual assault." House Research Org., Bill Analysis, Texas H.B. 1751, 80th Leg., R.S. (2007). Importantly, the law does not "claim any defined link between sexual assault and strip clubs." *Id.* The Texas Supreme Court explained that the $5 Fee Statute's purpose is directed "not at expression in nude dancing, but at the secondary effects of nude dancing when alcohol is being consumed." *Combs v. Texas Entm't Ass'n, Inc.*, 347 S.W.3d 277, 287-88 (Tex. 2011).

"[W]here the governmental purpose is the prevention of negative secondary effects associated with erotic dancing establishments, that purpose is unrelated to the suppression of expression." *Vaughn v. St. Helena Par. Police Jury*, 365 F. Supp. 2d 763, 769 (M.D. La. 2005) (citing *City of Erie v. Pap's A.M.,* 529 U.S. 277 (2000); *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41 (1986)). The Amended Rule targets Latex Clubs but leaves free from regulation the many types of businesses featuring nude entertainment but not falling within the traditional definition of cabaret. It's definition of "clothing" impermissibly broadens the $5 Fee Statute's scope to such a degree that it captures a broad range of businesses without regard to the statute's underlying purpose.

The Court should hold that the Amended Rule is impermissibly overbroad. The Comptroller provided no evidence linking the Amended Rule to the "secondary effects" purpose behind the $5 Fee Statute. The Amended Rule has no purpose, express or otherwise, outside of the text of the rule or its Preamble. (Trial Transcript, Vol I., 90:9-23). The Preamble itself does not state how expanding the $5 Fee Statute to apply to Latex Clubs furthers any government purpose. (*See* Plaintiff's Exhibit 2, pp. 1-5). The Amended Rule, according to the Preamble, is simply a utilitarian device serving few purposes other than facilitating "uniform enforcement" of the statute. (*Id.*, p. 1). The Comptroller offered no testimony and no evidence explaining how the Amended

Rule's definition of "clothing" – a definition centered on the type of material one wears – serves the $5 Fee Statute's purpose.

The Amended Rule's overbreadth is substantial when judged in relation to the $5 Fee Statute's intended scope. For instance, according to Mr. Zavala, he would have considered the woman on the left to be "nude" because she is not wearing cloth-based "clothing," while the woman on the right would not be considered "nude." Trial Transcript, Vol II, 8:1-11:11.



(Plaintiff's Exhibit 27, Plaintiff's Exhibit 28).

A number of hypothetical and real-world situations were explored during trial, all of which further demonstrate how the Amended Rule expands the scope of the $5 Fee Statute well beyond its legislative moorings. *See U.S. v. Hicks,* 980 F.2d 963, 969 (5th Cir.1992) (observing that "the rationale of the overbreadth doctrine is to protect the expressive rights of *third parties* who are not before the court") (emphasis original). The Amended Rule would sweep within the purview of the $5 Fee Statute performance artists covered in clay-like substances.[7] Under the Comptroller's strained and narrow interpretation of "clothing," the woman who appears on the cover of an album

---

[7] *See* https://www.washingtonpost.com/express/2018/10/16/clothed-mud-deborah-colkers-shape-shifting-dancers-conjure-brazils-poorest-region/ (last accessed November 26, 2019).

from 1965, *Whipped Cream & Other Delights,* would also be considered "nude" despite being completely covered because she is not wearing traditional cloth material.[8]

These examples and many others present in the record through the admission of the Comptroller's own witnesses show that the Amended Rule was not enacted to "regulate secondary effects" of featuring nude entertainment which would therefore permit "*de minimis* intrusions on expression" without the Amended Rule being impermissibly content based. *City of Erie v. Pap's A.M.*, 529 U.S. 277, 294 (2000). Rather, the Amended Rule's purpose is to impose the fee on any business featuring expressive entertainment using materials other than cloth to cover the relevant anatomical areas under the $5 Fee Statute.

Nor can the Comptroller take the position that the Amended Rule had any other purpose but to target Latex Clubs. The Comptroller's own attorney who worked on drafting the Amended Rule, when questioned what evidence, beyond the Preamble[9] itself, could evidence a governmental purpose for the Amended Rule, refused to testify and asserted deliberative process privilege, ***even after being informed that TEA planned to seek an adverse inference based on his refusal to tesify*:**

> Q. And I just want to make clear, for the record, that you're saying that outside the preamble, you can't state a basis or a reason for enacting the amended rule.  A. The basis for this decision is stated in the preamble. Q. I'm going to object to that response as nonresponsive. THE COURT: It is not responsive. Q. (BY MR. ALLEN) I just want to know if you can state a reason. MS. HARGIS: And I think, Judge, we object because we've already established the reason is deliberative process privileged. Whether he can state one or not is irrelevant. MR. ALLEN: And, your Honor, respectfully, if that's the position they're taking, then I think that it's conclusively established that there is no basis. If they're going to assert privilege over our right to ask questions over there was a basis, that's clearly within the law and I'll quote it. THE COURT: Listen, I'm not entirely sure that you're correct or

---

[8] https://en.wikipedia.org/wiki/Whipped_Cream_%26_Other_Delights (last accessed November 26, 2019).

[9] None of the Comptroller's witnesses could point to any portion of the Preamble articulating the government purpose for the Amended Rule beyond to "facilitate uniform enforcement" of the $5 Fee Statute as it existed prior to the Amended Rule. (Plaintiff's Exhibit 2, p. 2). The overwhelming weight of the evidence demonstrates that the Amended Rule in fact dramatically expanded the scope of the $5 Fee Statute.

you're incorrect, but they have the right to assert a privilege.  And if they assert a privilege, then you'll get a chance in closing argument to make the argument that they have forfeited an opportunity to argue that point. MR. ALLEN: Understood, your Honor. Q. (BY MR. ALLEN) Mr. Langenberg, I assume that you're not willing to waive the deliberative process privilege on that point. A. You are correct.

(Trial Transcript Vol. I, 90:19-91:24). However, when a party refuses to testify regarding a fact in issue because it asserts a privilege, the fact-finder is entitled to take an adverse inference. *See Kloster Speedsteel, AB v. Crucible, Inc.,* 793 F.2d 1565, 1579 (Fed. Cir. 1986) (when a party asserts privilege regarding whether they sought legal advice on whether a given action would violate a patent, which is relevant to a willfulness finding, the fact-finder is entitled to infer that either no advice was sought or it was sought and ignored). In this case, whether the Comptroller had a non-discriminatory basis or legitimate government interest in enacting the Amended Rule is of crucial importance to the case. Having chosen to use privilege to keep evidence relating to the Comptroller's true purpose for the Amended Rule (if any exists) out of evidence, the Court should disregard any argument from the Comptroller that there was a legitimate government purpose and find that there was none based on its assertion of privilege.

Lastly, an overbreadth challenge must be gauged according to whether the regulation "is not susceptible to a limiting construction that avoids constitutional problems." *Board of Airport Comm'rs v. Jews for Jesus, Inc.,* 482 U.S. 569, 574 (1987). The Amended Rule is not subject to a more narrowed construction because it expressly excludes from the definition of "clothing" certain materials which businesses had relied upon to avoid classification as a Sexually Oriented Business. Nor did the Comptroller present or attempt to present a limited reading of the Amended Rule to avoid constitutional issues. The Court should strike down the Amended Rule as overbroad.

**III.    The Comptroller's own confused reading of the Amended Rule and $5 Fee Statute require this Court to hold that the Amended Rule is Unconstitutionally Vague.**

In addition to the exceedingly broad scope and apparent confusion about what falls within the Comptroller's definition of "nude" pursuant to the Amended Rule, exactly what "businesses" the $5 Fee Statute could apply to is a matter left also largely up to interpretation and less than clear. The statute purports to apply to a myriad of listed businesses, including the broad catch-all of "other commercial enterprise." TEX. LOC. GOV'T CODE § 243.002 (defining "Sexually Oriented Business"); TEX. BUS. & COM. CODE § 102.001(2) (incorporating the local government code definition into the $5 Fee Statute). This type of catch-all phrase is exactly the type of statute the Supreme Court has ruled is unconstitutionally vague. (*See* Trial Transcript Vol. II, 54:17-54:19); *NAACP v. Button*, 371 U.S. 415, 433 (1963) ("standards of permissible statutory vagueness are strict in the area of free expression…Because First Amendment freedoms need breathing space to survive, government may regulate the area only with narrow specificity.").

Nor could the Comptroller identify a single type of business other than a Latex Club brought within the scope of the Amended Rule or what type of businesses would fall within "other commercial enterprise." (Trial Transcript Vol. II, 55:6-21). Accordingly, the Court ought to reconsider its Order granting partial summary judgment on Plaintiff's vagueness claim and hold that the Amended Rule is unconstitutionally vague. (Dkt. No. 50, pp. 33-34). Based on the way the Amended Rule is written and applied, a reasonable person cannot tell what speech is regulated and what is permitted,[10] chilling Plaintiff's right to free speech. *See Papachristou v. Jacksonville*, 405 U.S. 156, 162 (1972) (declaring a vagrancy law unconstitutional for vagueness). The Court

---

[10] It is also vague in such a manner that encourages arbitrary and discriminatory enforcement in violation of Plaintiffs' due process and equal protection rights. US CONST., amends. V, XIV.

should reconsider its order on summary judgment with respect to the TEA's vagueness claims and

hold that the Amended Rule is unconstitutionally vague.

## IV. The Comptroller's discriminatory enforcement of the $5 Fee Statute violates Equal Protection.

As the Court aptly observed in its summary judgment order:

> Whether the Comptroller, without any demonstrable justification, fails to enforce the $5 fee statute against businesses other than nude and latex clubs that similarly fall within the amended rule's definition of nudity is a genuine issue of material fact relating to Plaintiff's equal protection claim. *See Village of Willowbrook*, 528 U.S. 564 (2000) (recognizing a valid equal protection claim exists "where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and there is no rational basis for the difference in treatment.").

(Dkt. No. 50, p. 29) (full citation added and highlighting omitted). Essential to any equal protection

claim is proof that similarly situated individuals were treated differently. *Wheeler v. Miller*, 168

F.3d 241, 252 (5th Cir.1999).

At trial, the Comptroller failed to provide evidence that it enforced the Amended Rule

against anything but a Latex Club or the $5 Fee Statute against anything but a cabaret. The

Comptroller also failed to provide any basis for failing to enforce the $5 Fee Statute against myriad

businesses featuring nude entertainment in the presence of alcohol:

> A concert featuring Beyonce Knowles at NRG Stadium in Houston, Texas (Plaintiff's Exhibit 8; Trial Transcript Vol. II, 44:2-17).

> A performance at Warehouse Live in Houston featuring the Suicide Girls (Plaintiff's Exhibits 9 and 10; Trial Transcript Vol. II, 45:18-48:5).

> Waitress entertainers at Tight Ends[11] (League City and Plano, Texas), Redneck Heaven (Arlington, Fort Worth, and Lewisville, Texas), Twin Peaks (Houston, Texas), Wild Pitch Sports Bar (Frisco and Fort Worth, Texas), Knockout Sports Bar (Dallas, Texas), Tilted Kilt (Killeen, Laredo, McAllen, Midland, and San Antonio, Texas), Chulas (Houston, Texas), Ojos Locos (Dallas, Houston, San Antonio, and El Paso, Texas) (Plaintiff's Exhibit 12).

> A concert featuring Jennifer Lopez and other entertainers at Toyota Center in Houston, Texas. (Plaintiff's Exhibit 14).

---

[11] (*See also* Plaintiff's Exhibit 12).

Mr. Craft visited many of the above establishments and had personal knowledge that the waitresses both provided entertainment and the businesses were Sexually Oriented Businesses within the meaning of the $5 Fee Statute. (*See* Trial Transcript, Vol. II, 64:14-72:9 (Mr. Craft visited many of these clubs, the waitresses were "nude," they were providing entertainment, and alcohol was being served)). The Comptroller provided no evidence that it ever enforced the $5 Fee Statute against any of these businesses. Mr. Craft testified that in his years in the industry, he had never heard of the Comptroller enforcing the $5 Fee Statute against any establishments other than adult cabarets. (Trial Transcript, Vol II, 77:12-78:5). He has reviewed scores of appeals of $5 Fee Statute jeopardy determinations before the State Office of Administrative Hearings and none of them related to any businesses that were not traditional adult cabarets. (Trial Transcript, Vol. II, 74:17-75:2).

Mr. Craft is also personally familiar with the mode of operation for many businesses he believes subjectively meet the criteria for a Sexually Oriented Business under the Comptroller's broad reading, but that the Comptroller has never assessed the fee against:

> Q. (BY MR. WALLACE) Let me ask it a different way.  Ojos Locas, Knockout Sports Bar, Wild Pitch, Tight Ends, are there entertainers present that are exposing their buttocks and portions of their breasts below the top of the areola? A. Yes, sir. Q. Are they serving alcohol? A. Yes, they are. Q. Are there two or more people present? A. Absolutely. Q. And is there entertainment going on? A. Yes. Q. And you have personal knowledge of that? A. I do. Q. Was that same kind of entertainment being provided at -- when you were involved with Sports City and Sneaky Pete's back in early 2017? A. To some degree, yes. Q. At any time, did the comptroller assess Sneaky Pete's or Sports City with a $5 fee assessment? A. No. Q. Nor did they assess the $5 fee assessment to any of the entities in the scores of proposals for decisions you reviewed, correct? A. Correct.

(Trial Transcript Vol. II, 76:12-77:10).

The Comptroller's enforcement officer could likewise not point to any instance of the Comptroller seeking to enforce the $5 Fee against a business or similar commercial establishment

other than a cabaret. When asked about a list of commercial enterprises that potentially qualified as sexually oriented businesses, Ms. Williams could not remember if any of those other commercial establishments (not cabarets) were in fact assessed the fee. (Trial Transcript Vol. I, 116:16-118:22). Nor could Ms. Williams point to a single instance where she enforced her interpretation of "clothing" to exclude latex entertainment against any commercial establishment other than a cabaret. (Trial Transcript, Vol. I, 122:9-123:2). She could not recall the Comptroller enforcing the $5 Fee Statute against any burlesque shows, body building competitions, concerts, body paint competitions, or any type of business that did not feature entertainment in the form of expressive dance. (Trial Transcript, Vol. II, 117:7-118:4). The Comptroller certainly did not seek to present any such evidence.

Nor did the Comptroller seek to present any evidence regarding its basis for targeting cabarets or Latex Clubs in particular. In contrast, the TEA presented compelling evidence that the Amended Rule and the Comptroller's enforcement of the $5 Fee Statute against Latex Clubs was motivated by an improper purpose—to regulate and curtail expressive dance, which is "the exercise of a constitutional right." *Bryan v. City of Madison, Miss.*, 213 F.3d 267, 277 (5th Cir. 2000); *see City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000) (nude dancing as expressive conduct is protected by the First Amendment).

The Comptroller enacted the Amended Rule to target Latex Clubs and bring within the ambit of the $5 Fee Statute. (Trial Transcript, Vol. II, 17:22-18:3). As Mr. Zavala testified, "I haven't seen anybody wear latex other than these SOB establishments." (Trial Transcript Vol. I, 141:13-14). The Comptroller offered no alternative reason for extending the reach of the $5 Fee Statute to include Latex Clubs.

Promulgation of the Amended Rule in order to capture more cabarets speaks to a broader issue – the Comptroller's choice to enforce the $5 Fee Statute against some businesses and not others based on the kind of expression they offer. Mr. Zavala testified that if he encountered a bar or restaurant that featured waitresses, fully nude, serving alcohol to customers, he would not have assessed the $5 Fee Statute against such an establishment so long as there were no stage performances or lap dances provided. (Trial Transcript, Vol. II, 21:24-22:3). The Comptroller's "Sexually Oriented Business Observation Reports" further demonstrate the Comptroller's intent to enforce the $5 Fee Statute against cabarets and cabarets only. (Plaintiff's Exhibit 6). The Comptroller form asks enforcement officers to identify "what type of performances were observed" and presents only two discrete options:



(Plaintiff's Exhibit 6, p. 1). There is no purpose articulated by the Comptroller to promulgate the Amended Rule or enforce the $5 Fee Statute against only cabarets other than the desire to regulate protected expression.

Finally, in the context of an equal protection claim, the level of review rises to strict scrutiny when a fundamental right protected by the constitution is involved. *Duarte v. City of Lewisville, Texas*, 858 F.3d 348, 353 (5th Cir. 2017) ("Strict scrutiny is required [because] the legislative classification operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution"). If a Court holds that a challenged law violates the First Amendment, as the Court has done here with respect to the Amended Rule, then the appropriate standard for equal protection review is strict scrutiny:

> The Court has rejected Blastfax's First Amendment challenge to the TCPA's ban on unsolicited fax advertisements; strict scrutiny thus is not applicable to Blastfax's

equal protection claim on the basis that a First Amendment right is involved. *See Dunagin v. City of Oxford*, 718 F.2d 738, 752 (5th Cir.1983) ("In this case we have held the Mississippi law entirely legal under the First Amendment, and parties cannot insist on strict scrutiny merely by asserting a First Amendment right that the court ultimately finds not to be violated."), *cert. denied*, 467 U.S. 1259 (1984).

*Texas v. Am. Blastfax, Inc.*, 121 F. Supp. 2d 1085, 1092-93 (W.D. Tex. 2000) (Sparks, J.). "The Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives." *Police Dept. of City of Chicago v. Mosley,* 408 U.S. 92 (1972). The Amended Rule does not; in fact, the Comptroller presented no evidence of the purpose for the Amended Rule beyond the improper motive to target businesses featuring constitutionally protected expression. The Amended Rule and the Comptroller's enforcement of the $5 Fee Statute cannot sustain a strict scrutiny or even a rational basis review, and must be held unconstitutional.

## **<u>CONCLUSION</u>**

Plaintiff asks the Court to enter final judgment against the Comptroller on all issues raised, enter declaratory relief that the Amended Rule is unconstitutional, enter injunctive relief precluding enforcement of the Amended Rule and the $5 Fee Statute against businesses featuring entertainers covered within the plain meaning of the $5 Fee Statute prior to the adoption of the Amended Rule, award Plaintiff its attorneys' fees and expert fees, and for any further relief at law or equity to which Plaintiff is justly entitled.

Respectfully submitted,

WALLACE & ALLEN, LLP

By: _/s/ Casey T. Wallace_____
     Casey T. Wallace
     State Bar No. 00795827
     Benjamin W. Allen
     State Bar No. 24069288
     William X. King
     State Bar No. 24072496
     1400 Louisiana St., Suite 1500
     Houston, Texas 77002
     Tel: (713) 227-1744
     Fax: (713) 227-0104
     cwallace@wallaceallen.com
     ballen@wallaceallen.com
     wking@wallaceallen.com
     **ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document has been served on counsel of record in accordance with the Federal Rules of Civil Procedure by filing through the Court's ECF System on December 2, 2019.

     Melissa L. Hargis
     Michael Abrams
     Assistant Attorney Generals
     P.O. Box 12548, Capital Station
     Austin, Texas 78711
     Tel: (512) 463-2002
     Fax: (512) 478-4013
     Melissa.Hargis@oag.texas.gov
     Michael.Abrams@oag.texas.gov
     **ATTORNEYS FOR DEFENDANT**

          _/s/ Casey T. Wallace_____
          Casey T. Wallace