```
 1                  UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF TEXAS
 2                        AUSTIN DIVISION

 3   TEXAS ENTERTAINMENT        ) Docket No. A 17-CA-594 DAE
     ASSOCIATION, INC.          )
 4                              )
     vs.                        ) Austin, Texas
 5                              )
     GLENN HEGAR, COMPTROLLER   )
 6   OF PUBLIC ACCOUNTS OF      )
     THE STATE OF TEXAS, IN     )
 7   HIS OFFICIAL CAPACITY      ) October 23, 2019

 8
                        TRANSCRIPT OF BENCH TRIAL
 9             BEFORE THE HONORABLE DAVID A. EZRA
                        Volume 2 of 2
10

11   APPEARANCES:

12   For the Plaintiff:        Mr. Benjamin Allen
                               Mr. William X. King
13                             Mr. Casey T. Wallace
                               Feldman & Feldman, PC
14                             3355 West Alabama Street
                               Houston, Texas 77098
15

16   For the Defendant:        Mr. Michael Abrams
                               Ms. Melissa Hargis
17                             Texas Attorney General's Office
                               P.O. Box 12548
18                             Austin, Texas 78711-2548

19

20   Court Reporter:           Ms. Lily Iva Reznik, CRR, RMR
                               501 West 5th Street, Suite 4153
21                             Austin, Texas 78701
                               (512)391-8792
22

23

24

25   Proceedings reported by computerized stenography,
     transcript produced by computer.
```

# I N D E X

|              | Direct | Cross | Redirect | Recross |
| ------------ | ------ | ----- | -------- | ------- |
| Witnesses:   |        |       |          |         |
| Paul Zavala  | 7      | 26    |          |         |
| Steve Craft  | 31     | 86    |          |         |

|                                  | Page |
| -------------------------------- | ---- |
| Reporter's Certification Page    | 92   |

# E X H I B I T S

|  | Offered | Admitted |
|---|---|---|
| Plaintiff's | | |
| #8 through 9 | 45 | 45 |
| #11 | 49 | 55 |
| #13 | 60 | 60 |
| #27 through 28 | 12 | 12 |
| #29 | 15 | 15 |
| #30 | 39 | 39 |
| #31 | 83 | 84 |

Defendant's

(None.)

08:41:35   1          THE CLERK:  17-CV-594, <u>Texas Entertainment</u>

09:03:26   2   <u>Association, Incorporated vs. Glenn Hegar</u>.

09:03:37   3          THE COURT:  Good morning.

09:03:39   4          The Court would note the presence of all counsel.

09:03:43   5   And we have the witness on the stand.

09:03:46   6          Again, I want to reiterate something that I said

09:03:51   7   yesterday and I think it's important to note.  I have no

09:03:54   8   preconceptions in this case.  And my questioning counsel

09:03:59   9   about -- both sides about the state's and/or the

09:04:05  10   plaintiff's positions has to do with my trying to get a

09:04:10  11   clear understanding of what it is that you're arguing and

09:04:16  12   how it is that you're approaching this matter.

09:04:22  13          At first blush, I mean, we -- we've all -- I

09:04:27  14   mean, this is a serious matter.  Obviously it's serious to

09:04:29  15   the operators of these businesses and it's certainly

09:04:33  16   serious to the state that has -- the comptroller has an

09:04:37  17   interest in this matter, and the Court takes it seriously.

09:04:40  18   We joked a bit about it because it is kind of a crazy

09:04:44  19   thing, you know, I mean, but the case is nuanced.  It

09:04:51  20   really is.

09:04:53  21          And counsel is shaking their head.  I mean, the

09:04:56  22   arguments here are nuanced.  And so, you've gotta be

09:04:59  23   careful, particularly in looking at the statute, I wanted

09:05:02  24   to -- yesterday, I wanted to be sure I understood exactly

09:05:08  25   what we were talking about here in terms of how the state

09:05:14  1  is approaching this.  And now I understand the state is

09:05:17  2  taking the position -- which I wasn't entirely clear

09:05:23  3  about.  It had nothing to do with the First Amendment

09:05:25  4  issue.  The First Amendment issue was an expression issue.

09:05:29  5  This issue is not so much an expression issue as it is an

09:05:36  6  issue of whether the matter and mode in which this was

09:05:38  7  implemented and the way it is implemented caused some

09:05:46  8  constitutional injury, which is different than an

09:05:49  9  expression issue.  It's not an expression issue.

09:05:52  10      So I don't want anybody to think that the Court

09:06:01  11  is attempting to be flippant about this because I

09:06:04  12  certainly am not.  And I certainly don't want anybody to

09:06:07  13  think that I have a preconceived determination.  Quite

09:06:11  14  frankly, I have -- as I sit here today, I have no idea how

09:06:14  15  I'm going to rule in this because it is nuanced; it's not

09:06:21  16  as simple as it seems.

09:06:26  17      Quite frankly, this would be a much easier case

09:06:31  18  if we were simply talking about latex clothing you could

09:06:37  19  buy off the rack.  And I don't think anybody here

09:06:45  20  disagrees that there are items of clothing and some, in

09:06:50  21  some circles, quite popular that are made of various kinds

09:06:53  22  of plastic.  Some simulated leather, latex and other --

09:07:01  23  and I don't necessarily mean sexually suggestive objects.

09:07:05  24  I'm talking about pants, and jackets, and other things

09:07:09  25  that are made of these kinds of materials.

09:07:14   1          You know, when I was a young man and I remember

09:07:22   2   very well how polyester was regarded as a joke.  I mean,

09:07:27   3   people would joke about it, they had these polyester

09:07:30   4   double-knit suits, which were -- I even owned one once.

09:07:34   5   They were awful.  And now, high-grade polyester could be

09:07:42   6   more expensive than -- I actually had a case involving

09:07:47   7   this, so I know.  High-grade polyester could be more

09:07:52   8   expensive and considered a finer fabric in fashion

09:07:55   9   designers' repertoire than some of the highest grade,

09:08:02  10   nonsynthetic fabrics and it's no joke.

09:08:06  11          You could buy a $3,000 dress made out of very

09:08:11  12   high-grade polyester.  So I think that in looking at this

09:08:22  13   -- and obviously if we had a jury here, I would be

09:08:25  14   conducting this trial in a very, very different way.  You

09:08:29  15   would hear nothing out of me or very little out of me.

09:08:33  16   But we don't have a jury and I have the luxury of being

09:08:37  17   able to stop lawyers and ask them questions in the middle

09:08:41  18   of the proceeding because we don't have a jury, and this

09:08:46  19   is a very focused hearing.

09:08:47  20          So I wanted to get that on the record because I

09:08:50  21   don't want anybody to leave thinking that I've already

09:08:52  22   made up my mind, which I wish I had, actually.  It would

09:08:59  23   be a lot easier for me if I made up my mind.

09:09:01  24          All right.  Now, we have this gentleman on the

09:09:03  25   stand.  Let's finish him up.  Sir, I would remind you that

| | | |
|---|---|---|
| 09:09:10 | 1 | you remain under oath. |
| 09:09:11 | 2 | THE WITNESS:  Yes, sir, your Honor. |
| 09:09:14 | 3 | PAUL ZAVALA, called by the Plaintiff, duly sworn. |
| 09:09:14 | 4 | DIRECT EXAMINATION (Resume) |
| 09:09:14 | 5 | BY MR. WALLACE: |
| 09:09:21 | 6 | Q.   Good morning.  Mr. Zavala, how are you? |
| 09:09:22 | 7 | A.   Good.  Good morning. |
| 09:09:24 | 8 | Q.   I want to bring you back to your testimony from |
| 09:09:26 | 9 | yesterday.  I believe you testified yesterday that latex |
| 09:09:33 | 10 | did not qualify under the statute as proper clothing or |
| 09:09:38 | 11 | covering for an entertainer; is that correct? |
| 09:09:41 | 12 | A.   That's correct. |
| 09:09:42 | 13 | Q.   All right.  And that if an entertainer or performer |
| 09:09:50 | 14 | at a gentlemen's club was wearing something that was not |
| 09:09:55 | 15 | of cloth material or fabric, whether it be latex, gel, |
| 09:10:01 | 16 | foam, or whatever, that simply didn't cut it as far as the |
| 09:10:06 | 17 | enforcement division of the Comptroller's Office was |
| 09:10:09 | 18 | concerned. |
| 09:10:10 | 19 | Is that a fair summary of the opinion you gave |
| 09:10:13 | 20 | yesterday? |
| 09:10:13 | 21 | A.   Yes. |
| 09:10:14 | 22 | Q.   Okay.  I would like to show you a picture.  May I |
| 09:10:33 | 23 | approach the witness, your Honor? |
| 09:10:34 | 24 | THE COURT:  Yeah.  Sure. |
| 09:10:36 | 25 | Q.   (BY MR. WALLACE) I'm going to hand you a picture of a |

09:10:40  1  woman and ask if you recognize that as a outfit in which

09:10:46  2  the woman is wearing a latex dress?

09:10:58  3          THE COURT:  Well, in fairness, counsel, I don't

09:10:59  4  know if it says latex anywhere.  It says PVC.

09:11:03  5          MR. WALLACE:  Okay.

09:11:04  6          THE COURT:  PVC is polyvinyl chloride.  There may

09:11:08  7  be another word for latex.  I don't know.  Latex may be a

09:11:12  8  subcategory of PVC.  I don't know.  But it is plastic of

09:11:17  9  some sort.

09:11:18  10         MR. WALLACE:  You're absolutely -- your Honor,

09:11:20  11  you're absolutely right.  Thank you.

09:11:22  12  Q.  (BY MR. WALLACE) Mr. Zavala, would you agree with the

09:11:25  13  material as identified on the piece of paper you have

09:11:28  14  before you is high quality PVC?

09:11:31  15         MR. ABRAMS:  Objection, your Honor.  The witness

09:11:33  16  doesn't --

09:11:33  17         THE COURT:  Yeah.  He wouldn't have any idea

09:11:35  18  whether that was high quality or not.

09:11:38  19  Q.  (BY MR. WALLACE) Fair enough.

09:11:39  20         Would you agree that the document you have in

09:11:40  21  your hand identifies this as high quality PVC?

09:11:45  22         MR. ABRAMS:  Your Honor, I'm not sure where this

09:11:47  23  questioning's leading.

09:11:48  24         THE COURT:  Well, I don't know, but we're going

09:11:49  25  to find out.

09:11:53  1    A.    Based on one of the bullet points here, yes, that is

09:11:56  2    listed as the material.

09:11:58  3    Q.    (BY MR. WALLACE) Assuming that to be true, it's not

09:12:04  4    cloth or fabric material, correct?

09:12:05  5    A.    Correct.

09:12:05  6    Q.    And if an entertainer or a performer at a gentlemen's

09:12:10  7    club was wearing this outfit which covers her buttocks and

09:12:13  8    her breasts, she would nevertheless be in violation of the

09:12:18  9    rule imposed by the comptroller, right?

09:12:21  10   A.    That's correct.

09:12:22  11   Q.    Thank you.  Now, I'd like to show you another --

09:12:39  12          THE COURT:  I guess this is proof positive you

09:12:41  13   can buy anything on Amazon.

09:13:00  14   Q.    (BY MR. WALLACE) I'm going to hand you another

09:13:02  15   document with a picture of a woman wearing a dress.  Do

09:13:04  16   you see that woman wearing a dress?

09:13:06  17   A.    Yes, I do.

09:13:06  18   Q.    Now, I'd ask that you assume with me for purposes of

09:13:09  19   this question that this dress is of a hundred percent

09:13:14  20   cotton.  Are you with me?

09:13:15  21   A.    Yes.

09:13:16  22   Q.    She's -- her breasts are covered and her buttocks is

09:13:19  23   covered, correct?

09:13:20  24   A.    Yes.

09:13:20  25   Q.    And so are her genitals, for that matter, right?

| | | |
|---|---|---|
| 09:13:23 | 1 | A.   Correct. |
| 09:13:23 | 2 | Q.   If an entertainer or performer at a gentlemen's club |
| 09:13:26 | 3 | were wearing this dress, would she fall under the ambit of |
| 09:13:30 | 4 | the rule imposed by the comptroller to assess the $5 fee |
| 09:13:35 | 5 | statute? |
| 09:13:36 | 6 | MR. ABRAMS:  Objection.  This calls for a legal |
| 09:13:37 | 7 | conclusion and the witness lacks personal knowledge. |
| 09:13:42 | 8 | THE COURT:  Well, he could testify as to what he |
| 09:13:44 | 9 | would consider it to be.  He was somebody who was doing a |
| 09:13:46 | 10 | substantial number of these investigations for the |
| 09:13:49 | 11 | comptroller, and he testified that he did.  And he's the |
| 09:13:53 | 12 | one who would go out there and look and is charged with |
| 09:13:56 | 13 | knowing and understanding what he was looking at.  I mean, |
| 09:13:59 | 14 | I trust that you're not taking the position he didn't know |
| 09:14:01 | 15 | what he was doing. |
| 09:14:02 | 16 | MR. ABRAMS:  Well, your Honor, he was not an |
| 09:14:05 | 17 | enforcement at the time that the rule -- the amended rule |
| 09:14:08 | 18 | took effect.  So that's why there's an issue that his |
| 09:14:11 | 19 | testimony is irrelevant to the amended rule. |
| 09:14:15 | 20 | MR. WALLACE:  But, your Honor, he's testified |
| 09:14:17 | 21 | this entire time that as an enforcement officer, if he saw |
| 09:14:19 | 22 | a woman in latex, he would have assessed the fee. |
| 09:14:23 | 23 | THE COURT:  Yes, he did.  I'll overrule the |
| 09:14:26 | 24 | objection. |
| 09:14:26 | 25 | Q.   (BY MR. WALLACE) Let me ask the question again. |

09:14:28  1          THE COURT:  Certain parts of the rule remain the

09:14:30  2   same.

09:14:32  3   Q.   (BY MR. WALLACE) Let me ask the question again.

09:14:35  4   Assume with me that this woman's dress that you have

09:14:38  5   before you is 100 percent cotton, covers her breasts, her

09:14:45  6   areola, her breasts, her buttocks and her genitalia.

09:14:49  7   Assume with me she wears that dress to perform as an

09:14:52  8   entertainer at a gentlemen's club.

09:14:55  9          Would you enforce the $5 fee assessment against

09:14:57  10  that club if the entertainers wore this dress?

09:15:00  11  A.   No.

09:15:15  12  Q.   Can you please explain to Judge Ezra what on Earth is

09:15:18  13  the difference as far as enforcement of a fee by the

09:15:22  14  comptroller between the woman in the cotton dress on the

09:15:25  15  left on the screen and the woman in the high quality PVC

09:15:30  16  on the right?

09:15:31  17          MR. ABRAMS:  Objection.  That calls for a legal

09:15:33  18  conclusion.

09:15:33  19          THE COURT:  The Court can see for itself.  I

09:15:37  20  don't think I need him to tell me.

09:15:40  21          MR. WALLACE:  Okay.

09:15:43  22          THE COURT:  It would be an opinion from him.

09:15:46  23  That would be all it would be.

09:15:48  24          MR. WALLACE:  Fair enough, your Honor.

09:16:34  25          Your Honor, we've used the -- for purposes of Mr.

09:16:38   1   Zavala's testimony what has been marked by us as Exhibit

09:16:43   2   27, the woman depicted in the high quality PVC.  And we

09:16:48   3   have marked as Exhibit 28 the woman in the cotton dress.

09:16:52   4   And we would ask that those exhibits be admitted into

09:16:56   5   evidence.

09:16:59   6              MR. ABRAMS:  Your Honor, he never saw these

09:17:01   7   documents before, so we'd object on that ground if they

09:17:04   8   weren't produced in discovery.  And pursuant to your

09:17:06   9   ruling yesterday, we'd object to the extent they're

09:17:09   10  admitted for any substantive purpose.  You know, they

09:17:12   11  would only need to be -- they could only be admitted for

09:17:14   12  purposes of demonstrative evidence only, like the exhibit

09:17:18   13  yesterday.

09:17:18   14             THE COURT:  I'll receive them.

09:17:20   15             MR. WALLACE:  Thank you, your Honor.

09:17:28   16             THE COURT:  But I think counsel needs to

09:17:29   17  understand that I don't have the rule in front of me, but

09:17:33   18  that garment is a painted-on.  It isn't in liquid form.

09:17:38   19  It's a different -- it's different.

09:17:44   20             MR. WALLACE:  No.  I would agree, your Honor,

09:17:46   21  that at the time that that woman in the high quality PVC.

09:17:52   22             THE COURT:  According to Amazon, high quality

09:17:54   23  PVC.

09:17:55   24             MR. WALLACE:  Right.  The material was dry.

09:17:58   25             THE COURT:  Right.  Well, I don't think it didn't

```
09:18:00   1   -- well, I don't know.  How do I know whether it was ever

09:18:02   2   -- yeah.  It was liquid at some point obviously.

09:18:05   3          MR. WALLACE:  Right.

09:18:06   4          THE COURT:  It's plastic.

09:18:08   5          MR. WALLACE:  Right.  And that will be part of

09:18:11   6   our case-in-chief when we put another witness -- a

09:18:13   7   different witness on the stand.

09:18:19   8          THE COURT:  I mean, it was not an animal.  No

09:18:21   9   animal grew that.

09:18:23  10   Q.   (BY MR. WALLACE) That's right.  Last, but not least,

09:18:27  11   on pictures today, Mr. Zavala, do you know a woman by the

09:18:31  12   name of Kim Kardashian?

09:18:35  13   A.   Unfortunately, yes.

09:18:37  14   Q.   Very famous woman, correct?

09:18:38  15   A.   Yes.

09:18:39  16   Q.   Have you ever --

09:18:39  17          THE COURT:  She's famous because she's famous.

09:18:44  18          MR. WALLACE:  That's correct.  I agree, your

09:18:47  19   Honor.

09:18:47  20          THE COURT:  I have yet to find anybody to tell me

09:18:50  21   what her talent was, in any event.

09:18:52  22          MR. WALLACE:  I have to agree with you, your

09:18:54  23   Honor.

09:18:56  24   Q.   (BY MR. WALLACE) I'm going to show you one last

09:18:58  25   series of pictures.
```

09:19:04  1        May I approach the witness, your Honor?  There

09:19:10  2  are three pictures in the document I just handed you.  And

09:19:15  3  you recognize that as Kim Kardashian, right?

09:19:19  4  A.   Yes.

09:19:20  5  Q.   And underneath the pictures, it says what it really

09:19:22  6  takes to get into those latex dresses the Kardashians

09:19:26  7  love.  Do you see that?

09:19:27  8  A.   Yes.

09:19:29  9  Q.   Now, yesterday, I think you testified you've never

09:19:32  10  seen anybody wear latex, either in person or visually

09:19:40  11  somewhere.  You've seen people wear latex, haven't you?

09:19:44  12  A.   Now that I'm looking at this picture, yes.

09:19:47  13  Q.   Okay.  Clearly her buttocks or genitalia and her

09:19:53  14  breasts are covered, correct?

09:19:56  15  A.   Covered, yes.

09:19:57  16  Q.   And if she -- but if she wore this dress and

09:20:02  17  performed as a performer at a gentlemen's club, you would

09:20:10  18  assess the $5 fee against the gentlemen's club, correct?

09:20:15  19        MR. ABRAMS:  Objection, your Honor.  I think we

09:20:16  20  should clarify whether counsel is asking about before the

09:20:20  21  amended rule took effect or after the amended rule.

09:20:22  22        THE COURT:  I think that's a valid objection.  I

09:20:26  23  think you need to.

09:20:29  24        MR. WALLACE:  Fair enough.

09:20:31  25  Q.   (BY MR. WALLACE) Before the rule went into effect, if

09:20:34  1   Kim Kardashian showed up wearing one of these outfits and

09:20:40  2   performed as an entertainer at a gentlemen's club, you

09:20:46  3   would have assessed the $5 fee against that club, correct?

09:20:50  4   A.   Yes.

09:20:51  5   Q.   And after the rule went into effect, the same answer

09:20:54  6   would apply, correct?

09:21:04  7   A.   Can you repeat that?

09:21:05  8   Q.   After the rule went into effect, your answer would be

09:21:08  9   the same.  You would assess the $5 fee against the club if

09:21:12  10  Kim Kardashian showed up wearing a latex dress as depicted

09:21:17  11  in the exhibit before you?

09:21:19  12  A.   According to the amendment of the rule, yes.

09:21:22  13  Q.   Your Honor, we'd offer this as Exhibit 29.

09:21:27  14          MR. ABRAMS:  Your Honor, the same objection.

09:21:28  15          THE COURT:  It will be received.  Look, you know,

09:21:30  16  we're talking about these things and we know this case is

09:21:35  17  going on appeal, and we have three very bright judges,

09:21:39  18  very capable judges on the court of appeals are going to

09:21:41  19  look at this.  They're going to wonder what we're looking

09:21:43  20  at.

09:21:45  21          So I understand your objection.  If we had a

09:21:52  22  jury, it would be different, I think, but we don't.  And

09:21:57  23  I'm in a position to understand the difference between a

09:22:00  24  demonstrative exhibit and something that's substantive.

09:22:07  25          But I want to make sure that when the three

09:22:10  1   judges of the court of appeals panel look at this, they

09:22:13  2   know what we're talking about.  You know, it's very

09:22:17  3   frustrating to have us banter and I say, no, we're not,

09:22:21  4   and then, they don't have any idea what in the world we're

09:22:24  5   looking at.  Maybe that's good or bad.  I don't know.  But

09:22:29  6   I think, in all fairness, they have to have an opportunity

09:22:31  7   to see what we're looking at.

09:22:35  8   Q.   (BY MR. WALLACE) Mr. Zavala, isn't it true that there

09:22:45  9   is no purpose for the amended rule but to bring latex

09:22:50  10  clubs within the scope of the $5 fee?

09:22:55  11         MR. ABRAMS:  Objection.  Calls for a legal

09:22:56  12  conclusion.

09:22:57  13         THE COURT:  Yeah.  He's not equipped to answer

09:22:59  14  that question.  The objection's sustained.  He is not a

09:23:02  15  policy maker.  He can't speak for the controller.  His job

09:23:06  16  is to go out as a functionary.

09:23:10  17         MR. WALLACE:  If I could try to --

09:23:11  18         THE COURT:  That's like asking a -- you know, I

09:23:14  19  was a platoon leader and then, later, I held a higher

09:23:18  20  position.  Fine.  It would be like asking a squad leader

09:23:26  21  who is given an order by a first sergeant and who had been

09:23:33  22  given an order by me, who had been given an order by the

09:23:38  23  battalion commander, who had been given an order by the

09:23:41  24  general to do something and then, asking the squad leader,

09:23:44  25  what's the purpose of this order?

09:23:47  1          You know, I think that we are -- he's not -- and
09:23:51  2  this is no comment on him as an individual, but he is well
09:23:58  3  below the chain of command to know exactly what the
09:24:02  4  purpose is.  The only person that could answer that
09:24:05  5  question, I assume, would be the -- either the controller,
09:24:10  6  himself, or somebody who was intimately involved in the
09:24:14  7  decisionmaking.
09:24:17  8          MR. WALLACE:  I would more than agree with you,
09:24:20  9  your Honor.  My problem is that we subpoenaed the
09:24:24 10  comptroller, himself, to be here to answer that very
09:24:27 11  question, and the state moved to quash and obtained an
09:24:31 12  order from the magistrate to quash.  And unfortunately,
09:24:35 13  he's the only man I have to answer -- ask the question.
09:24:38 14  But if I can try to.
09:24:39 15          THE COURT:  I can't remember, did you appeal that
09:24:41 16  to me?
09:24:42 17          MR. WALLACE:  We did not, your Honor.
09:24:43 18          THE COURT:  Okay.
09:24:47 19          MR. WALLACE:  But I will move on.  I hear you
09:24:49 20  loud and clear.
09:24:53 21          THE COURT:  There might be other people other
09:24:55 22  than the comptroller who would be in a position to speak
09:24:58 23  for the agency.  I don't know who that might be.  But you
09:25:02 24  know, the bottom line is that I don't think there's any
09:25:08 25  question at all, zero question at all that the purpose of

09:25:16  1  the amendment was to bring latex clubs within the ambit of

09:25:26  2  the statute.  But why else would they amend the statute?

09:25:29  3          MR. WALLACE:  Thank you, your Honor.

09:25:30  4          THE COURT:  If they -- I don't think the state

09:25:33  5  would deny that the reason they did it was to bring it

09:25:36  6  within the ambit of the statute.  Now, why they had it in

09:25:41  7  the ambit of the statute is another story.  That's another

09:25:48  8  inquiry.  I know the state's stated reason is because

09:25:52  9  they're trying to -- I don't know, something about

09:25:55  10  drinking and nude dancing, or something like that, causing

09:26:02  11  raucous behavior.

09:26:09  12  Q.   (BY MR. WALLACE) Mr. Zavala, as an enforcement

09:26:25  13  officer, if you were to visit a nightclub, bar,

09:26:30  14  restaurant, or similar commercial enterprise, you could

09:26:34  15  see all kinds of different entertainment or performances

09:26:40  16  going on, right?

09:26:44  17  A.   I'm not certain of that.

09:26:46  18  Q.   Well, would you agree with me that you could see a

09:26:49  19  dance on a stage?

09:26:50  20  A.   I would, yes.

09:26:52  21  Q.   Would you agree with me that you could see dancing on

09:26:53  22  a bar?

09:26:55  23  A.   Yes.

09:26:56  24  Q.   You've seen the movie Coyote Ugly?

09:26:58  25  A.   I have not.

09:26:59   1   Q.   Okay.  Are you familiar with the concept of

09:27:02   2   bartenders or waitresses getting up on a bar and dancing

09:27:06   3   to entertain those who are within the bar?

09:27:08   4   A.   Yes.

09:27:09   5   Q.   Okay.  You could entertain a customer by sitting with

09:27:16   6   him and flirting with him and talking with him, correct?

09:27:21   7   A.   I don't agree.  No.

09:27:29   8   Q.   A dancer provocatively dressed, instead of taking a

09:27:38   9   drink order and going to the bar and getting a drink,

09:27:40   10  instead, sitting down with a customer and flirts with him,

09:27:43   11  you wouldn't consider that entertainment, sir?

09:27:51   12  A.   It's not part of a performance.  It's not an act.

09:27:56   13  Q.   You're absolutely right.  It's not an act or a

09:27:58   14  performance, correct?  But the statute doesn't require

09:28:00   15  that, does it?

09:28:14   16  A.   I don't know.  I'm not seeing that in the statute.

09:28:17   17  Q.   Well, let's look at it.  It's up on the screen before

09:28:21   18  you, Section 102.051 of the Texas Business and Commerce

09:28:28   19  Code, provides that -- and it's in subsection 2, sexually

09:28:40   20  oriented business means a bar, a nightclub, bar,

09:28:43   21  restaurant, or similar commercial enterprise that provides

09:28:45   22  for an audience of two or more individuals, live nude

09:28:51   23  entertainment, or live nude performances.

09:28:59   24       Did I read that correctly, sir?

09:29:01   25  A.   Yes, you did.

09:29:02  1  Q.   Would you agree with me that they can either be

09:29:04  2  providing entertainment to fall within the statute or

09:29:07  3  there could be live nude performances, correct?

09:29:10  4  A.   Correct.

09:29:11  5  Q.   It could be either one, right?

09:29:14  6  A.   Yes.

09:29:15  7  Q.   Would you agree with me that someone can be dressed

09:29:18  8  in a manner that makes them nude under the statute, sit

09:29:21  9  and flirt with a customer and spend an hour or two with

09:29:24  10  him and entertain him at a gentlemen's club?

09:29:37  11  A.   No.  I don't agree, because --

09:29:39  12  Q.   Well, what on Earth do you think she's doing from

09:29:43  13  your perspective as an enforcement officer?

09:29:46  14  A.   From my perspective, if I'm having a conversation

09:29:49  15  with somebody, it doesn't necessarily constitute

09:29:52  16  entertainment.

09:30:01  17  Q.   If the entertainers or performers at a bar,

09:30:05  18  restaurant, or other commercial enterprise are fully

09:30:10  19  clothed in cloth or fabric-like material, but the

09:30:15  20  waitresses and wait staff are nude, does that qualify as a

09:30:20  21  sexually oriented business in your opinion as an

09:30:21  22  enforcement officer?

09:30:23  23  A.   I'm sorry.  Can you repeat that again?

09:30:25  24  Q.   Certainly.  If the people who are classified as

09:30:29  25  entertainers or performers are fully clothed in

09:30:34    1  fabric-like material, but the waitresses serving alcohol
09:30:40    2  and food to the customers are nude, under the terms of the
09:30:46    3  statute, does that make it a sexually oriented business
09:30:48    4  against whom you would enforce the statute?
09:30:53    5          MR. ABRAMS:  Your Honor, I think this line of
09:30:55    6  questioning has been asked and answered at this point, and
09:30:57    7  he's giving his opinion about --
09:30:58    8          THE COURT:  No.  This is a different line
09:31:00    9  entirely.  I don't think anybody's asked about whether, in
09:31:07   10  his view, there would be a violation of the statute if
09:31:11   11  they -- and there are businesses around that have this
09:31:15   12  type of mode of operation where the baristas, or
09:31:27   13  whatever -- I remember there was a coffee shop somewhere
09:31:32   14  in this area, I don't remember where it was, but they had
09:31:34   15  kind of a bikini baristas, or topless baristas, or
09:31:39   16  something like that, and then, they had -- there was
09:31:42   17  another place that had very scantily clad women serving
09:31:46   18  food.  That is a mode of operation of some of these
09:31:51   19  businesses.
09:31:52   20          So no.  I think he can answer the question if he
09:31:56   21  can answer it.
09:32:02   22  A.   Based on that statement alone, no.
09:32:13   23  Q.   (BY MR. WALLACE) Waitresses, fully nude, serving
09:32:17   24  alcohol to customers, so long as there's not a stage
09:32:20   25  performance or a lap dance being provided, then there's no

09:32:23  1   assessment of the $5 fee.  That's your testimony, correct?

09:32:30  2   A.   Yes.

09:32:31  3   Q.   And this fee and this rule is specifically targeted

09:32:35  4   to go after gentlemen's clubs that have expressive dancing

09:32:39  5   and expressive performances on stage, as far as an

09:32:44  6   enforcement officer, that's your opinion, correct?

09:32:47  7           MR. ABRAMS:  Objection.  That calls for a legal

09:32:49  8   conclusion.

09:32:49  9           THE COURT:  Sustained.  He's not an expert.  He

09:32:52  10  could testify about what he knows and this is well beyond

09:32:55  11  his --

09:32:56  12          MR. WALLACE:  Fair enough.

09:32:57  13          THE COURT:  -- capacity.

09:32:58  14          MR. WALLACE:  I think I've made my point.

09:33:02  15  Q.   (BY MR. WALLACE) Would you agree that enforcement

09:33:05  16  officers make decisions and that the comptroller assesses

09:33:09  17  the $5 fee sometimes in the total of millions of dollars

09:33:14  18  against clubs where those decisions are ultimately

09:33:19  19  overturned by an administrative law judge?

09:33:24  20  A.   It's possible.  Yes.

09:33:25  21  Q.   All right.  And for the Court's edification, when you

09:33:31  22  make an assessment as an enforcement officer, the

09:33:36  23  comptroller eventually sends a bill, or a statement, or

09:33:39  24  something, to the taxpayer, telling them how much they

09:33:43  25  owe, correct?

```
09:33:45   1   A.   That sounds right.  Yes.

09:33:46   2   Q.   And the taxpayer can ask for a redetermination of

09:33:48   3   that amount, correct?

09:33:50   4   A.   Correct.

09:33:51   5   Q.   They can ask for a redetermination to determine that

09:33:54   6   they're not even a sexually oriented business, correct?

09:33:57   7   A.   Yes.

09:33:57   8   Q.   And when that's done, it ultimately makes it to the

09:34:01   9   State Office of Administrative Hearings, correct?

09:34:04  10   A.   Yes.

09:34:05  11   Q.   And evidence is put on and testimony is provided to

09:34:08  12   an administrative law judge, correct?

09:34:13  13   A.   I'm not certain of the process.

09:34:16  14   Q.   Have you ever testified over at the State Office of

09:34:18  15   Administrative Hearings?

09:34:19  16   A.   Yes, I have.

09:34:20  17   Q.   Okay.  So you're familiar with providing testimony to

09:34:23  18   an administrative law judge, correct?

09:34:24  19   A.   Yes.

09:34:25  20   Q.   And the administrative law judge then can make a

09:34:28  21   decision as to whether or not the business is or is not a

09:34:34  22   sexually oriented business, in the first place, correct?

09:34:36  23   A.   Yes, they can.

09:34:37  24   Q.   And if he reverses the comptroller's decision, the

09:34:44  25   comptroller can reverse the administrative law judge and
```

09:34:47   1   say, too bad, my decision stands, correct?

09:34:50   2   A.   I'm not aware of that.

09:34:52   3   Q.   As an enforcement --

09:35:14   4            THE COURT:  I'm going to be honest with you,

09:35:16   5   counsel.  I don't know whether you're going to get there

09:35:17   6   or not, but I am not at all -- I mean, we've had a lot of

09:35:26   7   testimony about dark latex or dark paint.  I don't know,

09:35:30   8   do we have exhibits here that actually show what these

09:35:33   9   people look like in a way that we could see it?  There was

09:35:36   10  a blurry photograph, there were un -- you couldn't make it

09:35:39   11  out.

09:35:42   12           Because we don't have anything in the record

09:35:45   13  right now that I'm aware of where one can actually see

09:35:50   14  what is being complained of here.  We've got all kinds of

09:35:56   15  pictures in here about women who are dressed in, you know,

09:36:02   16  latex dresses.  We've got pictures of women who are

09:36:05   17  wearing other suggestive clothing.  Some would be in

09:36:11   18  violation, others would not be in violation.  But we don't

09:36:19   19  have anything in the record about what this actually looks

09:36:25   20  like.

09:36:27   21           Do you have anything that you're going to put in?

09:36:29   22           MR. WALLACE:  I don't have a picture to put in

09:36:31   23  with this witness, your Honor.

09:36:32   24           THE COURT:  I don't care about this witness.  I'm

09:36:34   25  talking about during the trial.

09:36:36  1            MR. ALLEN:  Yes.

09:36:37  2            MR. WALLACE:  Yes, your Honor.

09:36:38  3            THE COURT:  Because I've seen some pictures here.

09:36:39  4  I don't know whether these are pictures of the women

09:36:41  5  dancing that are wearing this stuff, but you can't make it

09:36:43  6  out.  They're so blurry and so undiscernible that I

09:36:47  7  certainly can't make it out.  And I don't think the court

09:36:50  8  of appeals judges are going to be able to make it out

09:36:52  9  either unless they have much better eyes than I do.

09:36:55  10            MR. WALLACE:  I hear you loud and clear, Judge.

09:36:57  11  And I assume that the pictures you are looking at are

09:37:00  12  Exhibit 14, and those are not the pictures I'm making

09:37:03  13  reference to.

09:37:03  14            THE COURT:  Okay.  Well.

09:37:05  15            MR. WALLACE:  But I will put some pictures in the

09:37:07  16  record through a different witness.

09:37:08  17            THE COURT:  All right.

09:37:09  18            MR. WALLACE:  Of what we're talking about.  Just

09:37:11  19  two last areas of inquiries with this witness, if I may.

09:37:14  20  Q.  (BY MR. WALLACE) As an enforcement officer, sir,

09:37:21  21  would you assess the $5 fee statute against a cabaret

09:37:25  22  during a timeframe in which the club was not open for

09:37:31  23  business?

09:37:37  24  A.  Not if there's anything to observe, no.

09:37:40  25  Q.  And as an enforcement officer, can you imagine any

09:37:52  1  member of the Comptroller's Office assessing the $5 fee

09:37:56  2  statute against a business during a timeframe in which the

09:38:00  3  business had burned down to the ground and there were no

09:38:05  4  customers, dancers, performers, or even employees inside

09:38:09  5  the business?

09:38:10  6         MR. ABRAMS:  Objection.  Calls for speculation.

09:38:11  7         THE COURT:  Sustained.  He's not the person to

09:38:18  8  answer that question.

09:38:20  9  Q.  (BY MR. WALLACE) You would not, as an enforcement

09:38:22  10  officer, enforce the $5 fee statute against a business

09:38:25  11  entity that had burned down to the ground, correct?

09:38:30  12  A.  It's not a business at that point.  No.

09:38:32  13  Q.  Thank you.  I'll pass the witness, your Honor.

09:38:46  14         THE COURT:  Do you have any questions for him?

09:38:49  15         MR. ABRAMS:  Yes, your Honor.

09:38:55  16                    CROSS-EXAMINATION

09:39:06  17  BY MR. ABRAMS:

09:39:06  18  Q.  Good morning, Mr. Zavala.

09:39:08  19  A.  Morning.

09:39:09  20  Q.  I just want to clear some things up with your

09:39:11  21  testimony.  Understandably, it may have been a little

09:39:15  22  confusing, some of the questions you were asked.

09:39:17  23         You never enforced the amended rule, correct?

09:39:19  24  A.  I did not.

09:39:21  25  Q.  Okay.  Would you agree with me that the amended rule,

09:39:24  1   which is up here before you in (a)(1), says that

09:39:28  2   clothing -- says that paint, latex, wax, gel, foam,

09:39:33  3   coatings, and other substances applied to the body in a

09:39:36  4   liquid or semiliquid state are not clothing; is that

09:39:40  5   correct?

09:39:40  6   A.   That's correct.

09:39:42  7   Q.   And you couldn't tell from the images that the

09:39:46  8   plaintiff's counsel showed you whether or not any part of

09:39:49  9   the dresses were liquid latex that was painted on,

09:39:52  10  correct?

09:39:53  11  A.   That's correct.

09:39:55  12  Q.   And if a dancer was wearing a dress that was not

09:39:58  13  painted on and it covered everything, you wouldn't assess

09:40:03  14  a tax, correct?

09:40:03  15  A.   Could you repeat that?

09:40:04  16  Q.   Sure.   If a dancer was wearing a dress that was

09:40:07  17  not --

09:40:07  18        THE COURT:   Counsel, you know, you folks need to

09:40:12  19  get your story straight, okay?   We had objections from

09:40:15  20  your co-counsel earlier that he wasn't the one who

09:40:18  21  assessed anything, and now you're asking him a leading

09:40:23  22  question essentially about whether he would be the one to

09:40:27  23  assess the tax, which it isn't, it's a fee.   But that's

09:40:31  24  another story.

09:40:33  25        So.

09:40:34  1          MR. ABRAMS:  I'm just trying to clean up the

09:40:37  2  questions that were directed to him in direct examination,

09:40:42  3  your Honor.

09:40:42  4          THE COURT:  Okay.  Well, you opened the door.

09:40:44  5  Q.  (BY MR. ABRAMS) Mr. Zavala, you testified yesterday

09:40:47  6  that you didn't do collection, correct?

09:40:49  7  A.  That's correct.

09:40:50  8  Q.  What are collections?

09:40:51  9  A.  The liability's already been established and we're

09:40:56 10  making a collection attempt.

09:40:58 11  Q.  So, Mr. Zavala, you were a field officer for the

09:41:03 12  comptroller?

09:41:06 13  A.  With these SOB observations and assessments, it would

09:41:10 14  have been 2015.

09:41:12 15  Q.  Okay.  Did you ever stop making SOB field visits?

09:41:18 16  A.  Yes.

09:41:19 17  Q.  When did you stop doing that?

09:41:22 18  A.  The best of my knowledge, the end of 2015.

09:41:27 19  Q.  Did you ever act as a field officer after October 28,

09:41:31 20  2016?

09:41:35 21  A.  No.

09:41:37 22  Q.  What is your current position at the comptroller?

09:41:41 23  A.  I'm an enforcement officer in the taxpayer service

09:41:44 24  area of our field office.

09:41:46 25  Q.  And how long have you held that position for?

| 09:41:52 | 1 | A.   Since 2016. |

A.   Since 2016.

Q.   And in that position, are you involved in enforcement of the SOB fee?

A.   Not at all.

Q.   Okay.  No further questions, your Honor.

THE COURT:  Anything else?

MR. WALLACE:  I have no redirect, your Honor.

THE COURT:  Okay.  You could step down.

MR. ALLEN:  Your Honor, at this time, we'd move for a trial amendment to apply or, rather, to add the discriminatory enforcement claim to enforcement of the $5 fee statute against latex clubs prior to the adoption of amended rule.  You heard during the cross-examination of Officer Zavala that he enforced this statute against latex clubs prior to the amended rule, but did not have any experience after the amended rule.

The testimony he offered as to enforcement against non-cabarets or lack of enforcement against non-cabarets and the enforcement against latex clubs shows that we have a claim of discriminatory enforcement prior to adoption of the amended rule.  Apparently the comptroller was acting as if the amended rule had already been passed back when he was doing enforcement.

MS. HARGIS:  We certainly object to that.  This court has already ruled when they attempted to amend to

09:43:13   1   add the statutory challenges the first time that it was

09:43:17   2   too late.  This is certainly too late.  This case, what

09:43:23   3   they have always pleaded was about the amended rule and

09:43:25   4   not the statute.  And if anything, those facts that

09:43:27   5   they're now complaining of go to their due process claim

09:43:30   6   and whether the clubs had notice prior to the amendment of

09:43:33   7   the rule or not.

09:43:34   8          This is not a separate claim and challenge to the

09:43:37   9   statute based on all of the pleadings and all of the

09:43:39  10   discovery and the Court's prior rulings in this case.

09:43:43  11          THE COURT:  Well, there is a place and the rules

09:43:48  12   do provide that parties may under certain circumstances be

09:43:52  13   allowed to conform their complaint to evidence where it is

09:44:01  14   some -- where justice so requires.  And the district court

09:44:05  15   is given a great deal of latitude in that.

09:44:08  16          But in this case, I'm going to deny that request

09:44:10  17   because the information here could and should have been

09:44:15  18   within the knowledge of the plaintiff long before this

09:44:19  19   trial began.  After all, the plaintiff is actually

09:44:23  20   representing clubs for which these enforcement actions

09:44:27  21   were initiated, and they would certainly know whether

09:44:31  22   those enforcement actions would have taken place prior to

09:44:36  23   the amendment.

09:44:36  24          So the objection is -- to the amendment is

09:44:40  25   sustained.  I'm not going to allow you to amend at this

| | | |
|---|---|---|
| 09:44:43 | 1 | point.  There's no justification for it. |
| 09:44:46 | 2 | MR. ALLEN:  Thank you, your Honor. |
| 09:44:50 | 3 | MR. WALLACE:  Your Honor, our next witness will |
| 09:44:53 | 4 | be Mr. Steve Craft.  But would it be okay with the Court |
| 09:44:57 | 5 | if we take a five or a ten-minute break? |
| 09:44:59 | 6 | THE COURT:  Sure.  Of course. |
| 09:45:00 | 7 | MR. WALLACE:  Thank you. |
| 09:51:52 | 8 | (Recess.) |
| 10:09:31 | 9 | THE COURT:  The Court would note the presence of |
| 10:09:36 | 10 | all counsel.  Yes, sir. |
| 10:09:38 | 11 | MR. WALLACE:  May we proceed? |
| 10:09:39 | 12 | THE COURT:  You may. |
| 10:09:40 | 13 | MR. WALLACE:  Your Honor, at this time, we would |
| 10:09:41 | 14 | call Mr. Steve Craft. |
| 10:09:43 | 15 | THE COURT:  All right. |
| 10:09:51 | 16 | THE CLERK:  Raise your right hand.  You do |
| 10:10:04 | 17 | solemnly swear that the testimony you are about to give in |
| 10:10:07 | 18 | this case now before the Court will be the truth, the |
| 10:10:08 | 19 | whole truth, and nothing but the truth, so help you God? |
| 10:10:11 | 20 | THE WITNESS:  I do. |
| 10:10:14 | 21 | STEVE CRAFT, called by the Plaintiff, duly sworn. |
| 10:10:14 | 22 | DIRECT EXAMINATION |
| 10:10:14 | 23 | BY MR. WALLACE: |
| 10:10:19 | 24 | Q.  Good morning, sir. |
| 10:10:19 | 25 | Would you please introduce yourself to Judge |

| | | |
|---|---|---|
| 10:10:22 | 1 | Ezra? |
| 10:10:22 | 2 | A.   My name is Steve Craft. |
| 10:10:23 | 3 | Q.   And can you tell us what your position is with the |
| 10:10:30 | 4 | Texas Entertainment Association? |
| 10:10:31 | 5 | A.   I'm a member and a representative. |
| 10:10:33 | 6 | Q.   And by whom are you regularly employed? |
| 10:10:39 | 7 | A.   I serve as officer on several different corporations. |
| 10:10:44 | 8 | Burch Management is a parent corporation.  And then, |
| 10:10:46 | 9 | there's numerous other ones that operate businesses here |
| 10:10:49 | 10 | in the state of Texas. |
| 10:10:50 | 11 | Q.   Okay.  And is it fair to say that you are the |
| 10:10:53 | 12 | president of -- or an officer of a number of |
| 10:10:58 | 13 | establishments we colloquially call gentlemen's clubs? |
| 10:11:03 | 14 | A.   Yes, sir. |
| 10:11:04 | 15 | Q.   We could also call them adult cabarets? |
| 10:11:07 | 16 | A.   You could. |
| 10:11:07 | 17 | Q.   And you have been an officer, president, or held some |
| 10:11:10 | 18 | capacity in sports bars? |
| 10:11:14 | 19 | A.   Correct.  Correct.  Restaurant, sports bars. |
| 10:11:17 | 20 | Q.   All right.  And to move this along pretty quick, can |
| 10:11:22 | 21 | you give an identity of a sports bar in which you've been |
| 10:11:26 | 22 | an officer and perhaps the identity of a club that's more |
| 10:11:29 | 23 | likely known as a gentlemen's club? |
| 10:11:31 | 24 | A.   Sneaky Pete's. |
| 10:11:34 | 25 | THE COURT:  What are the location of these |

| | | |
|---|---|---|
| 10:11:36 | 1 | places?  Is this here in Austin, Texas?  I mean, this |
| 10:11:40 | 2 | involves the entire state of Texas that we're talking |
| 10:11:42 | 3 | about here? |
| 10:11:43 | 4 | MR. WALLACE:  It does, your Honor.  And if I |
| 10:11:44 | 5 | could ask that question. |
| 10:11:45 | 6 | Q.   (BY MR. WALLACE) You are the president of or officer |
| 10:11:47 | 7 | of companies that are gentlemen's clubs in the Dallas |
| 10:11:51 | 8 | market, the Fort Worth market, the Houston market, |
| 10:11:53 | 9 | throughout the state of Texas, correct? |
| 10:11:55 | 10 | A.   Correct.  Dallas/Fort Worth. |
| 10:11:59 | 11 | THE COURT:  I know, but if he's listing the names |
| 10:12:01 | 12 | of people -- of clubs, he needs to give us the location of |
| 10:12:06 | 13 | the clubs or it doesn't mean anything. |
| 10:12:08 | 14 | MR. WALLACE:  Thank you, your Honor. |
| 10:12:09 | 15 | Q.   (BY MR. WALLACE) Would you do that?  Can you give a |
| 10:12:11 | 16 | list of the clubs, the adult cabaret clubs and their |
| 10:12:16 | 17 | location? |
| 10:12:16 | 18 | A.   The ones that I'm currently an officer of are Baby |
| 10:12:21 | 19 | Dolls Saloon in Dallas, Texas, Baby Dolls Fort Worth in |
| 10:12:25 | 20 | Fort Worth, Texas, the Fare in Arlington, Texas, Cabaret |
| 10:12:31 | 21 | Royale in Dallas, Texas, and Chicas -- Michael's |
| 10:12:36 | 22 | International, Chicas Locas in Houston, Texas. |
| 10:12:40 | 23 | THE COURT:  Now, are these all what we would call |
| 10:12:42 | 24 | gentlemen's clubs?  Or are they conventional sports bars? |
| 10:12:45 | 25 | THE WITNESS:  These are all gentlemen's clubs. |

10:12:47   1   Our concept is a sports bar, but they're sexually oriented

10:12:50   2   business -- gentlemen's clubs, also.

10:12:51   3          THE COURT:  All right.

10:12:52   4   Q.   (BY MR. WALLACE) And are you also or have you been an

10:12:55   5   officer of Sneaky Pete's or any other sports bar?

10:13:00   6   A.   Yes.  Sneaky Pete's in Lewisville, Texas.  Sports

10:13:07   7   City in Durant, Oklahoma.  That's not Texas.  Sports City

10:13:12   8   in Mesquite, Texas, Sports City in Rowlett, Texas, Sports

10:13:19   9   City in The Colony, Doc's Pizza in Frisco, Texas.  I'm

10:13:31  10   sure there's others over the past few years that I'm

10:13:34  11   blanking on.

10:13:35  12   Q.   That's fair.  But those are more traditionally called

10:13:37  13   sports bars, as opposed to cabaret, correct?

10:13:41  14   A.   That is correct.

10:13:41  15   Q.   All right.  And how long have you been in this

10:13:45  16   business?

10:13:46  17   A.   Since 1987.

10:13:49  18   Q.   Are you familiar with latex that is worn at

10:13:55  19   gentlemen's clubs throughout the state of Texas?

10:13:57  20   A.   Yes, I am.

10:13:58  21   Q.   All right.  Can you please tell the Court what latex

10:14:05  22   is, where it comes from, and how it's applied to a dancer

10:14:12  23   at a cabaret?

10:14:13  24   A.   Sure.  Latex, in its raw form, is a milky liquid

10:14:18  25   substance.  All latex comes from a latex plant, latex

10:14:24 1   tree.  From that point, it can be bottled, typically

10:14:28 2   ammonia's put in it to keep it from solidifying.  There is

10:14:32 3   ammonia-free latex that they will put some other type

10:14:36 4   substance in to keep it from hardening or solidifying at

10:14:39 5   that point.  So it stays in the bottle.

10:14:42 6          They can take it and spread it out in sheets,

10:14:45 7   tint it to whatever color they want.  When they put it out

10:14:48 8   in sheets, they would cut it and make into a -- cut a

10:14:53 9   pattern out.

10:14:54 10          As far as a liquid latex, when it's applied to

10:14:57 11  someone, it's not painted on.  It's done with sponges.

10:15:01 12  There's four coats put on.  Four coats would be equivalent

10:15:04 13  to a surgical glove.  In fact, if you took your hand and

10:15:07 14  stuck it in latex, pulled it out, let it dry, suck it

10:15:11 15  back, did that four times, you would have the equivalent

10:15:14 16  of latex gloves, surgical gloves that you could peel off.

10:15:19 17          It's applied to the breast.  It's applied with

10:15:23 18  sponges.  You put four coats on, letting each coat dry.

10:15:28 19  Sometimes the girls use hair dryers.  But it takes three

10:15:32 20  or four minutes to dry.  You cannot see through it at all.

10:15:37 21  Latex -- there is no clear latex.  It's white, thick,

10:15:41 22  milky when it comes out.  So even raw form, you can't see

10:15:44 23  through it.

10:15:45 24          But four coats are applied.  It's not real pretty

10:15:49 25  when it's put on.  So the girls will put powder, makeup,

10:15:55  1  some kind of decorative over the top of it.  And then, so

10:15:58  2  that it won't -- that won't rub off on themselves or a

10:16:03  3  customer's coat, they'll put a -- like a lacquer spray

10:16:07  4  over it that will seal it.  A lot of them use hairspray

10:16:11  5  and it seals it.

10:16:13  6        The only way to get it off is peeled off.  It

10:16:16  7  doesn't flake off, and it's not going to peel off on its

10:16:22  8  own.  You're going to have to tug it and peel it off.  So

10:16:24  9  that's kind of.

10:16:25  10       THE COURT:  Does it peel off in one --

10:16:27  11  essentially one contiguous -- it bonds together, so if you

10:16:32  12  can even start it, say, at the side, you could -- you

10:16:37  13  would peel it off like you would peel off a decal, for

10:16:42  14  instance.

10:16:42  15       THE WITNESS:  Exactly.  And just like on a decal,

10:16:44  16  sometimes you're peeling off the decal and you pull the

10:16:47  17  wrong way and it tears, well, it will tear off in strips.

10:16:50  18  But if you pull it -- just correct pressure and just pull,

10:16:54  19  yes, it will peel off just like a solid decal.  And you

10:16:57  20  will have the latex -- now, when it comes off, it's going

10:17:03  21  to shrink up because when it goes on, adheres to the body,

10:17:06  22  it tightens up.  So it's going to shrink up, and it would

10:17:10  23  be difficult to put back on in that same manner as when

10:17:14  24  you first applied it.

10:17:15  25       THE COURT:  Okay.

10:17:17  1    Q.   (BY MR. WALLACE) When the $5 fee rule was enacted by

10:17:23  2    the Texas legislature, were there clubs you were

10:17:27  3    personally associated with that chose to go the latex club

10:17:32  4    route, as opposed to the topless club route, in order to

10:17:37  5    avoid the payment of the $5 fee?

10:17:42  6    A.   Yes.

10:17:43  7    Q.   And that would include Chicas Locas in Houston,

10:17:47  8    Texas?

10:17:47  9    A.   Yes.  It was dual -- it was a fee and the ordinance,

10:17:50  10   but yes.

10:17:55  11   Q.   And it wasn't until 2017 that a new rule that was

10:17:59  12   adopted by the comptroller came into effect where they

10:18:02  13   said latex doesn't apply, correct?

10:18:04  14   A.   That is correct.

10:18:07  15   Q.   Before 2017, did the comptroller ever come to any

10:18:11  16   club you were associated with that was a latex club and

10:18:16  17   say latex doesn't count?

10:18:20  18   A.   No.  I had a visit around that time from three

10:18:25  19   different enforcement officers that came in about 12:30 in

10:18:29  20   the morning, it's after midnight, and they wanted to look

10:18:34  21   at the licenses.  They looked around and what they told my

10:18:37  22   GM, because I was on the phone with them when he was

10:18:40  23   talking to them, is everything looks good.  So we had no

10:18:46  24   -- we had them in there, but there wasn't any problems

10:18:49  25   that we knew of.

10:18:50  1          THE COURT:  When was this, sir?

10:18:51  2          THE WITNESS:  That was right before the rule was

10:18:54  3  enforced.  I would say late 2016.

10:18:57  4          THE COURT:  You're talking about the amendment?

10:19:00  5          THE WITNESS:  Yes.  Yes, sir.

10:19:02  6  Q.   (BY MR. WALLACE) Now --

10:19:03  7          THE COURT:  They told you everything was okay?

10:19:06  8          THE WITNESS:  They told my general manager and I

10:19:08  9  was on the phone with them when he's talking to them.  We

10:19:10 10  have a policy, any time we have enforcement come in, I

10:19:13 11  have to be notified, even if it's 2:00 or 3:00 in the

10:19:17 12  morning.

10:19:17 13          THE COURT:  Sure.

10:19:18 14  Q.   (BY MR. WALLACE) Now, Mr. Craft, you have testified

10:19:23 15  quite a bit about this latex stuff, haven't you?

10:19:27 16  A.   Yes, sir.

10:19:27 17  Q.   In administrative law judge proceedings, in

10:19:29 18  depositions, and in trial, correct?

10:19:32 19  A.   Yes, sir.  Even more than this.  We started latex --

10:19:35 20  we went through this drill in Dallas back in the late

10:19:40 21  '90s.  So this is not new to us.

10:19:43 22  Q.   Okay.  And do you have a mannequin in your office?

10:19:46 23  A.   I do.

10:19:47 24  Q.   And does that mannequin have latex applied to its

10:19:51 25  breasts?

10:19:52  1  A.   It does.

10:19:52  2  Q.   And you have a picture of that?

10:19:54  3  A.   I do.

10:19:54  4  Q.   All right.  May I approach the witness, your Honor?

10:19:58  5       THE COURT:  Yes.

10:20:03  6  Q.   (BY MR. WALLACE) Mr. Craft, I'm going to hand you a

10:20:08  7  picture and ask you to identify it for the Court.

10:20:10  8  A.   That's a mannequin in my office that we finally refer

10:20:13  9  to as Sally.

10:20:14  10 Q.   Your Honor, this mannequin -- I mean, this exhibit

10:20:17  11 was attached to Mr. Craft's affidavit in our proceedings

10:20:19  12 on our motion for summary judgment, and I would ask that

10:20:31  13 it be admitted as Plaintiff's Exhibit No. 30.

10:20:34  14      THE COURT:  Have you seen this?

10:20:36  15      MR. ABRAMS:  Yes, your Honor.  We have no

10:20:38  16 objection.

10:20:38  17      THE COURT:  All right.  It will be received.

10:20:41  18 Q.   (BY MR. WALLACE) Can you see it up on the screen,

10:20:43  19 Exhibit No. 30?

10:20:44  20 A.   Yes, sir.

10:20:44  21 Q.   All right.  And please tell the Court what this is.

10:20:47  22 A.   That's a mannequin with latex on it.  Did not put the

10:20:52  23 make-up or decoration on it.  Wanted to show the raw form

10:20:55  24 of latex.  The color on that is called Michael's Mix.

10:21:00  25 Consequently, the club in Houston is Michael's

10:21:02  1  International Chicas Locas.  We order so much -- ordered

10:21:07  2  so much at the time, that we wanted a certain color, and

10:21:12  3  they mix it up for us and it's called Michael Mix.  It's a

10:21:18  4  -- the club is mainly Hispanic and we wanted -- needed a

10:21:21  5  darker tone than what they normally had.  So we have our

10:21:24  6  own blend of latex.

10:21:27  7       THE COURT:  What -- I assume that you make sure

10:21:32  8  that none of these women are allergic to latex.

10:21:36  9       THE WITNESS:  Yes, sir, we do.  We also have

10:21:40  10  non-ammonia latex.  Typically what people -- what

10:21:43  11  irritates people is the ammonia.  I have had girls that

10:21:48  12  say, I can't work -- I can't wear that.  We do have a

10:21:52  13  non-ammonia, which is -- it has some other type chemical

10:21:59  14  in it.

10:21:59  15       THE COURT:  What happens when you have a young

10:22:02  16  woman in your club who is allergic to latex that says, I

10:22:05  17  can't wear it?  Is she just not working in your club?

10:22:10  18       THE WITNESS:  She could wear a bikini.  The

10:22:12  19  problem with the bikini -- the reason we went with latex

10:22:15  20  is on the bikini, a girl could move.  She could be

10:22:20  21  dancing, it could slip.  We had a nipple slip on the

10:22:24  22  Superbowl with Janet Jackson.

10:22:26  23       THE COURT:  Certainly right.

10:22:27  24       THE WITNESS:  This can't slip.  This is not going

10:22:29  25  anywhere.  It would be forceful to take it off, peel it

| | |
|---|---|
| 10:22:32 | 1 |
| 10:22:36 | 2 |
| 10:22:38 | 3 |
| 10:22:44 | 4 |
| 10:22:45 | 5 |
| 10:22:49 | 6 |
| 10:22:54 | 7 |
| 10:22:59 | 8 |
| 10:23:00 | 9 |
| 10:23:07 | 10 |

1  off.  So a girl couldn't, if she wanted to, flash.  I

2  mean, they're independent contractors.  They're there to

3  make money.  She couldn't flash.  It couldn't slip, it

4  couldn't get hung on something.

5          THE COURT:  I suspect also that with the bikini,

6  part of the buttocks would be exposed and, therefore --

7  unless it was one of these 1950s style.

8          THE WITNESS:  You're absolutely right.  And

9  that's the reason we use the boy shorts is what they wear.

10          THE COURT:  Yes.  They even call them boy shorts

11  in Hawaii, where I'm from.

12          THE WITNESS:  Right.  Either cheerleader shorts,

13  which would be what a cheerleader on Friday right would

14  wear at a game, under their skirts, is a boy short is what

15  they would be wearing.

16          THE COURT:  So the short that you're showing on

17  that mannequin is the typical dress of your dancers in

18  your clubs.

19          THE WITNESS:  Yes.  I went out and bought 200

20  cheerleader briefs a couple of days before we went to the

21  latex.  And then, the person who runs the boutique at the

22  club, he went out and had these -- I told him what I

23  wanted.  He works with the designer, had these designed,

24  and that's what they wore majority of the time.  But to

25  make sure we're in compliance, we start off with the

10:23:53   1   cheerleader briefs.

10:23:54   2        THE COURT:  Okay.

10:23:55   3   Q.  (BY MR. WALLACE) The latex on this particular

10:23:59   4   mannequin is quite brown.  Wouldn't you say?

10:24:03   5   A.  Yes.

10:24:03   6   Q.  All right.  Can it come in different colors?

10:24:05   7   A.  It does.

10:24:06   8   Q.  What colors does it come in?

10:24:09   9   A.  You know, they have a variety of colors:  Red, blue,

10:24:12   10   purple, flesh, light tan, dark tan.  You can get a mix of

10:24:18   11   any color you want.  I mean, this is a mix that they did

10:24:21   12   for us if you buy enough of it.  But yeah, it comes in a

10:24:26   13   variety of colors.  And we do have some pink, some purples

10:24:29   14   for decoration.  Like I said, I didn't put the decoration

10:24:34   15   on this because I wanted to show just the raw form of the

10:24:36   16   latex.

10:24:42   17   Q.  If you had -- for the record, I would say I'm average

10:24:48   18   Caucasian color.

10:24:49   19   A.  Right.

10:24:49   20   Q.  Could you put latex on me, somewhere on my body that

10:24:53   21   would be non-see-through to cover up that portion of my

10:24:57   22   body?

10:24:57   23   A.  Yes.

10:24:58   24   Q.  And is that what happens inside the clubs for people

10:25:02   25   who are at the same skin tone than I am?

10:25:04  1    A.    If they choose to do that.  Yes.  Some want it to
10:25:10  2    stand out.  So.
10:25:11  3    Q.    Someone wearing latex in your clubs, can you see any
10:25:14  4    portion of their breasts from the top of the areola down
10:25:18  5    to the bottom of the breasts?
10:25:19  6    A.    Absolutely not.
10:25:20  7    Q.    Can you see the sides of the breasts that are covered
10:25:23  8    with latex?
10:25:23  9    A.    No.  Everything on the breasts from above -- the
10:25:27  10   point above the areola is completely covered.
10:25:29  11   Q.    Okay.  And they wear boy shorts that are similar to
10:25:36  12   the boy shorts that are shown in Exhibit No. 30?
10:25:38  13   A.    That's an actual pair that came from the boutique
10:25:41  14   which a gentleman named Shafique owns that's inside the
10:25:45  15   club.
10:25:45  16   Q.    And that completely covers the buttocks?
10:25:47  17   A.    Yes, sir.
10:25:48  18   Q.    Not three quarters, but it covers the whole thing?
10:25:51  19   A.    Covers the whole buttocks.
10:26:12  20   Q.    I'd like you to turn to Exhibit No. 8.  Please.
10:26:18  21   A.    Yes, sir.
10:26:19  22   Q.    Are you familiar with Exhibit 8?  Have you seen this
10:26:33  23   exhibit before?
10:26:33  24   A.    Yes, I have.
10:26:34  25   Q.    All right.  Who is depicted in Exhibit 8?

| | | |
|---|---|---|
| 10:26:37 | 1 | A.   That's Beyonce. |
| 10:26:39 | 2 | Q.   And is her buttocks exposed? |
| 10:26:42 | 3 | A.   Yes. |
| 10:26:43 | 4 | Q.   Where was she performing? |
| 10:26:44 | 5 | A.   NRG Stadium in Houston. |
| 10:26:48 | 6 | Q.   And at that performance, were you there? |
| 10:26:50 | 7 | A.   I was. |
| 10:26:50 | 8 | Q.   Was there alcohol being served? |
| 10:26:51 | 9 | A.   Yes, sir. |
| 10:26:52 | 10 | Q.   Was there an audience of two or more people? |
| 10:26:54 | 11 | A.   Yes, sir. |
| 10:26:54 | 12 | Q.   Was she giving a live performance? |
| 10:26:59 | 13 | A.   Yes, she was. |
| 10:27:00 | 14 | Q.   Is she nude, from your perspective, under the |
| 10:27:03 | 15 | definitions contained within the statute? |
| 10:27:05 | 16 | A.   Yes, sir. |
| 10:27:07 | 17 | Q.   Do you know -- well, I'll get back to that. |
| 10:27:11 | 18 |      How many people, if you know, approximately, can |
| 10:27:19 | 19 | fit inside NRG stadium? |
| 10:27:21 | 20 | A.   I believe the capacity's around a hundred thousand. |
| 10:27:23 | 21 | Q.   Was the stadium full? |
| 10:27:25 | 22 | A.   Except -- yeah.  Pretty much full. |
| 10:27:31 | 23 | Q.   If you'd turn to Exhibit No. 9, please. |
| 10:27:36 | 24 | A.   Yes, sir. |
| 10:27:37 | 25 | Q.   Are you familiar with Exhibit 9? |

10:27:39   1   A.   Yes, I am.

10:27:40   2   Q.   All right.  This depicts women who are performing?

10:27:42   3              THE COURT:  Wait.  We don't have Exhibit 9 up.

10:27:48   4              MR. WALLACE:  Ah, I apologize, your Honor.  I

10:27:58   5   believe Exhibit 8 and 9 have already been admitted into

10:28:00   6   evidence.

10:28:02   7              THE COURT:  I believe so.  Yeah.  It says NSFW,

10:28:06   8   not safe for work.  Not safe for work, but I guess it's

10:28:09   9   safe for federal courthouse.

10:28:12  10              MR. WALLACE:  That's right, your Honor.

10:28:14  11              THE CLERK:  They haven't been admitted.

10:28:15  12              THE COURT:  They haven't been admitted?  Okay.

10:28:17  13   She says they haven't been admitted.

10:28:19  14              THE CLERK:  Eight and 9, not admitted.

10:28:21  15              MR. WALLACE:  We'd ask that Exhibit No. 8 and 9

10:28:23  16   be admitted into evidence.

10:28:24  17              MR. ABRAMS:  Your Honor, just to make our record,

10:28:26  18   we'd object on the basis that foundation and

10:28:32  19   authentication of these exhibits.

10:28:33  20              THE COURT:  Well, it is what it is.  It's a

10:28:34  21   picture of what appears to be women dancing in rather

10:28:39  22   scanty costumes, if any costume at all, I think.  In part.

10:28:48  23   It will be received.

10:28:51  24   Q.   (BY MR. WALLACE) Mr. Craft, you previously testified

10:28:55  25   by way of affidavit about this exhibit.  You obtained it

10:29:00  1    from the Houston Press publication, correct?

10:29:04  2    A.    That is correct.

10:29:04  3    Q.    That's a publication that is in Houston, Texas?

10:29:07  4    A.    It is.

10:29:07  5    Q.    All right.  And for purposes of the record, you found

10:29:15  6    it at www.Houstonpress.com/slideshow/suicide-girls-

10:29:27  7    scorch-warehouse-live.

10:29:30  8    A.    Correct.

10:29:31  9    Q.    And it's from a May 1st, 2017 performance, correct?

10:29:37  10   A.    It was from the May 1st article in the Post.

10:29:41  11   Q.    Okay.  Thank you.  And the event occurred on April

10:29:43  12   29th, correct?

10:29:44  13   A.    That is correct.

10:29:44  14   Q.    2017.

10:29:46  15   A.    Yes.

10:29:46  16   Q.    After the enactment of the rule.

10:29:48  17   A.    That is correct.

10:29:49  18   Q.    Okay.  Now --

10:29:50  19            THE COURT:  When you say rule, I assume you're

10:29:53  20   talking about the amendment.

10:29:54  21            MR. WALLACE:  Yes, your Honor.  I apologize.

10:29:58  22   Q.    (BY MR. WALLACE) Does this -- the pictures contained

10:30:01  23   within Exhibit 9, which is a multitude of pages, show

10:30:05  24   women whose breasts are exposed?

10:30:10  25   A.    Yes.

10:30:10  1   Q.   Over the top of the areola?

10:30:12  2   A.   Yes, sir.  They have electrical tape over the nipple

10:30:16  3   in a X, but the breasts everywhere else is exposed.

10:30:20  4   Q.   And that would be on page 1 of 9 and on page 4 of 9

10:30:27  5   -- excuse me, 1 of 9, 6 of 9 of Exhibit 9, 7 of Exhibit 9

10:30:42  6   and 8 of Exhibit 9, correct?

10:30:45  7   A.   Correct.

10:30:45  8   Q.   All right.  And in these various pages, especially on

10:30:50  9   page 1 of Exhibit 9, is the dancer who's facing away from

10:30:56  10  the camera, is her buttocks exposed?

10:30:59  11  A.   Yes.  She would be wearing what would generally be

10:31:02  12  referred to as a T-back or a G-string.

10:31:06  13  Q.   It pretty much shows the entirety of her with

10:31:08  14  buttocks being exposed, correct?

10:31:10  15  A.   The idea is, it could show the anus or portions of

10:31:17  16  the anus or genitalia.  Can't tell from here.

10:31:19  17  Q.   Okay.  And at -- have you ever been to Warehouse

10:31:24  18  Live?

10:31:24  19  A.   I have not.

10:31:25  20  Q.   Okay.  Are you familiar with it?

10:31:26  21  A.   Yes.

10:31:27  22  Q.   Do they serve alcohol, if you know?

10:31:29  23  A.   Yes, they do.

10:31:30  24  Q.   Do they have audiences?

10:31:31  25  A.   Yes, they do.

10:31:32  1   Q.   Are there two or more people in attendance?

10:31:37  2   A.   Yes.

10:31:37  3   Q.   And they provide live entertainment, correct?

10:31:42  4   A.   That is correct.

10:31:42  5   Q.   Are they nude under the definition of the statute

10:31:45  6   from your perspective?

10:31:46  7   A.   They were this time.

10:31:47  8   Q.   Okay.  I'd like you to turn to the Exhibit 10.  I'll

10:32:02  9   withdraw that, your Honor.

10:32:04  10         You were here yesterday when Ms. Williams gave

10:32:08  11  her testimony, correct?

10:32:09  12  A.   Correct.

10:32:10  13  Q.   Did you hear her testify about how she searched the

10:32:13  14  social media websites of businesses to determine which

10:32:16  15  ones were potential targets of the statute and the rule?

10:32:21  16  A.   Yes.

10:32:21  17  Q.   If you went to search the social media websites of

10:32:28  18  bars like Tight Ends, Redneck Heaven, Twin Peaks, Wild

10:32:37  19  Pitch or Knockout Sports Bars, would you be able to see

10:32:41  20  whether or not they clad their personnel in outfits which

10:32:48  21  would qualify them as nude under the statute, assuming the

10:32:52  22  other elements of the statute are met?

10:32:54  23  A.   Certainly those websites would show that on their

10:32:58  24  websites.  Absolutely.

10:32:59  25  Q.   Okay.  And did you go and make an endeavor recently

| | | |
|---|---|---|
| 10:33:05 | 1 | to determine whether or not the bars I listed a moment ago |
| 10:33:10 | 2 | actually depict states of nudity in their social media |
| 10:33:15 | 3 | platforms? |
| 10:33:15 | 4 | A.   Yes. |
| 10:33:16 | 5 | Q.   And would that be what is at Exhibit 11 in your book? |
| 10:33:25 | 6 | A.   Yes, sir. |
| 10:33:31 | 7 | Q.   Okay.  And does that show people in states of nudity |
| 10:33:36 | 8 | at the various bars I mentioned a moment ago? |
| 10:33:39 | 9 | A.   Correct. |
| 10:33:39 | 10 | Q.   And you went on the internet and found these, didn't |
| 10:33:43 | 11 | you? |
| 10:33:43 | 12 | A.   I did. |
| 10:33:43 | 13 | Q.   Your Honor, Exhibit 11 is a compilation of these |
| 10:33:50 | 14 | websites, which show as an example women at bars, such as |
| 10:34:03 | 15 | Tight Ends in League City, Texas, in states of nudity as |
| 10:34:09 | 16 | defined under the rule and under the statute.  And we |
| 10:34:12 | 17 | would ask that Exhibit 11 be admitted into evidence. |
| 10:34:17 | 18 |         MR. ABRAMS:  Your Honor, for the record, two |
| 10:34:18 | 19 | objections.  First is relevance, and the second, you know, |
| 10:34:21 | 20 | we don't know who posted these, when they were -- |
| 10:34:23 | 21 |         THE COURT:  Well, there's an overbroad claim |
| 10:34:26 | 22 | here, also, I think.  Is there not? |
| 10:34:27 | 23 |         MR. ABRAMS:  There is an overbreadth claim. |
| 10:34:30 | 24 |         THE COURT:  Okay.  And one of the issues here is |
| 10:34:32 | 25 | whether this statute would capture artistic and other |

10:34:37  1    types of activity.  For instance, we just saw a photograph

10:34:43  2    of fairly well-known group.  It's not my favorite group,

10:34:49  3    that's for sure, but nonetheless, a very popular group

10:34:53  4    which is -- what do they call themselves?  Suicide Dolls.

10:34:56  5         THE WITNESS:  SuicideGirls.

10:34:58  6         THE COURT:  They're very popular among a certain

10:35:00  7    group of audience, and they dance on stage in a manner

10:35:04  8    that I think we would all agree violates the letter of

10:35:08  9    this regulation in terms of nudity.  There's no question

10:35:13  10   about it.  And I think that's uncontested under the

10:35:21  11   definition that I was given by counsel yesterday, which is

10:35:24  12   the state's position.

10:35:27  13        MR. ABRAMS:  Well, I don't think there's been

10:35:27  14   evidence entered in this case about what -- how the

10:35:30  15   SuicideGirls -- I believe there's an image, but I don't

10:35:32  16   think we've seen or heard any testimony about how they

10:35:35  17   perform.

10:35:40  18        THE COURT:  Are you taking -- are you seriously

10:35:44  19   taking issue with whether that was a legitimate

10:35:47  20   performance?

10:35:49  21        MR. ABRAMS:  No, your Honor.  I personally don't.

10:35:51  22        THE COURT:  I mean, it's an article.  I mean, if

10:35:52  23   you are, that's fine.  But.

10:35:54  24        MR. ABRAMS:  I have never heard of the

10:35:56  25   SuicideGirls before this trial.

| | | |
|---|---|---|
| 10:35:58 | 1 | THE COURT:  You hadn't? |
| 10:35:59 | 2 | MR. ABRAMS:  No.  I hadn't. |
| 10:36:00 | 3 | THE COURT:  Well, listen, if I have, then -- |
| 10:36:03 | 4 | believe me, I'm 72 years old, I don't listen to |
| 10:36:06 | 5 | SuicideGirls, but I certainly have seen their materials |
| 10:36:10 | 6 | depicted in the media.  I mean, that's a fact.  But you |
| 10:36:19 | 7 | don't need to do SuicideGirls. |
| 10:36:21 | 8 | I mean, you can go to the San Antonio Ballet, by |
| 10:36:27 | 9 | the way, where the women wear -- when they don't have the |
| 10:36:33 | 10 | full leggings on, some of them wear in a modern dance |
| 10:36:41 | 11 | performances.  They wear what looks like a very thin |
| 10:36:48 | 12 | material.  I don't know, is leotard the right word?  Is |
| 10:36:54 | 13 | that the right word?  Yeah.  When their buttocks is |
| 10:36:57 | 14 | clearly exposed more than would be allowed under the |
| 10:37:01 | 15 | statute, and where, by the way, during intermission, they |
| 10:37:05 | 16 | serve drinks and people are allowed to drink. |
| 10:37:09 | 17 | So that would be captured by this statute. |
| 10:37:17 | 18 | MR. ABRAMS:  I think it would depend on if all |
| 10:37:19 | 19 | the conditions of -- |
| 10:37:19 | 20 | THE COURT:  The only thing it would depend on is |
| 10:37:21 | 21 | whether the state sent somebody to the ballet.  That's |
| 10:37:24 | 22 | what it would depend on.  Because the statute doesn't say |
| 10:37:29 | 23 | it's restricted to men's clubs.  That's what they're |
| 10:37:32 | 24 | trying to prove, and you're saying that it doesn't.  That |
| 10:37:34 | 25 | would be discriminatory enforcement. |

10:37:36  1          MR. ABRAMS:  Well, it applies to nightclubs, bars
10:37:38  2  and restaurants.  So I'm not sure ballet would be a
10:37:41  3  nightclub, bar or restaurant.
10:37:41  4          THE COURT:  Okay.  Is that discriminatory
10:37:43  5  enforcement?
10:37:45  6          MR. ABRAMS:  I think it's -- no.  I think it's
10:37:48  7  enforcement of the statute that is allowed to define the
10:37:52  8  specific places that it applies to.
10:37:55  9          THE COURT:  But the whole idea is that you don't
10:37:56 10  want women to be performing in a nude state in front of
10:38:02 11  people who are drinking.  Isn't that the justification for
10:38:05 12  the statute?  That's what you say is the justification for
10:38:08 13  the statute, right?
10:38:10 14          MR. ABRAMS:  Right.  I believe my co-counsel
10:38:11 15  yesterday spoke to those justifications.
10:38:14 16          THE COURT:  Okay.  And so, if people are at a
10:38:18 17  play or they're at a cabaret, which has -- or a restaurant
10:38:27 18  that has live entertainment and it has somebody singing in
10:38:32 19  a leotard that exposes her buttocks, a singer now in a
10:38:38 20  leotard with heels that exposes her buttocks, you would
10:38:42 21  agree with me that partially now -- and I'm not saying
10:38:46 22  she's nude, okay?  I'm not saying she's indecently dressed
10:38:51 23  no more than you would see in a one-piece -- modern
10:38:54 24  one-piece bathing suit, she would be in violation of that
10:39:00 25  law or the rule, right?

10:39:04  1          MR. ABRAMS:  She would need to -- the business

10:39:07  2   would need to meet all the requirements.

10:39:09  3          THE COURT:  The requirements are pretty simple.

10:39:12  4   You serve alcohol, you have entertainment, and you're one

10:39:16  5   of these categories.  You're a restaurant, or a bar, or a

10:39:23  6   club, right?

10:39:25  7          MR. ABRAMS:  Or similar commercial enterprise,

10:39:27  8   yes.

10:39:27  9          THE COURT:  Or a similar commercial enterprise.

10:39:30 10   What does that mean?  What is a similar commercial

10:39:33 11   enterprise?

10:39:35 12          MR. ABRAMS:  It's --

10:39:35 13          THE COURT:  Can you tell me?

10:39:38 14          MR. ABRAMS:  I think it's something that is as

10:39:45 15   the statute or as the amended rule suggests, something

10:39:48 16   similar to what is in there, which is a nightclub, a bar,

10:39:51 17   or a restaurant.  So.

10:39:52 18          THE COURT:  A sexually oriented business is a

10:39:55 19   nightclub, bar, restaurant, or similar commercial

10:39:59 20   enterprise.  I don't know what that means.  I'm trying to

10:40:03 21   figure out what a similar commercial enterprise would be.

10:40:06 22   That's why I said, what about a performance, say, at the

10:40:11 23   Majestic Theater in San Antonio where they do serve

10:40:14 24   alcohol, and people go and watch, and they do have modern

10:40:20 25   dance performances there where parts of women's bodies are

10:40:25  1  exposed to a greater degree than would be otherwise

10:40:29  2  allowed by this statute, then the question is, are they a

10:40:37  3  similarly situated thing?

10:40:42  4          MR. ABRAMS:  I don't believe a concert hall or a

10:40:44  5  ballet would be similar to --

10:40:46  6          THE COURT:  This isn't a concert hall.  It's a

10:40:48  7  theater.

10:40:49  8          MR. ABRAMS:  Or theater.

10:40:50  9          THE COURT:  I said -- so you say that isn't.

10:40:53  10          MR. ABRAMS:  No.

10:40:53  11          THE COURT:  But if I asked somebody else, they

10:40:55  12  might say that it was.

10:40:57  13          MR. ABRAMS:  I don't believe so.  I think the --

10:40:58  14          THE COURT:  You don't believe so.

10:41:00  15          MR. ABRAMS:  No, your Honor.

10:41:01  16          THE COURT:  Okay.  Well, that's what I've gotta

10:41:05  17  figure out.  But the problem here is that it's a very

10:41:09  18  broad statute.  When you put tag lines on a statute like

10:41:14  19  "or similarly situated," that's the kind of thing the

10:41:19  20  Supreme Court has struck down as being vague.

10:41:25  21          MR. ABRAMS:  Well, we disagree that it's vague.

10:41:27  22  I mean, in fact, well, the Court --

10:41:29  23          THE COURT:  Can you tell me what a similarly

10:41:31  24  situated business would be?

10:41:34  25          MR. ABRAMS:  In fact, I believe the Court granted

10:41:37   1   our motion for summary judgment on the vagueness claim.

10:41:40   2         THE COURT:  Yeah.  I may be revisiting it in

10:41:43   3   light of this.  What is the similarly situated?  Can you

10:41:50   4   name one?

10:41:52   5         MR. ABRAMS:  I think -- yeah.  Sure.  A cafe or a

10:42:00   6   bistro perhaps.

10:42:03   7         THE COURT:  Pizza parlor, maybe.

10:42:10   8         MR. ABRAMS:  Possibly.  Sure.  It's a restaurant.

10:42:13   9         THE COURT:  Has the agency ever cited anyone or

10:42:20  10   any entity that runs a pizza parlor or other such where

10:42:32  11   they have live entertainment -- let's say, they have

10:42:35  12   singers in the corner.  You've seen this, right, western

10:42:38  13   clubs, they have singers.  Other clubs, they have singers,

10:42:41  14   people come in and sing, and sometimes the women are

10:42:45  15   wearing things that they wouldn't necessarily wear outside

10:42:48  16   of a performance.

10:42:51  17         MR. ABRAMS:  Your Honor, the best answer I can

10:42:52  18   give is, I don't know the answer.

10:42:54  19         THE COURT:  Yeah.  I don't think I would know,

10:42:55  20   and I doubt it.  But I would be surprised.

10:43:03  21         MR. ABRAMS:  Your Honor, I believe we had last

10:43:05  22   stood up to object to Exhibit 11 to make --

10:43:08  23         THE COURT:  Your objection's overruled because

10:43:12  24   this is, I assume, a waitress?

10:43:14  25         MR. WALLACE:  Yes, your Honor.

| | | |
|---|---|---|
| 10:43:17 | 1 | Q.   (BY MR. WALLACE) Mr. Craft. |
| 10:43:19 | 2 | A.   Yes, sir. |
| 10:43:19 | 3 | Q.   On page 2 of Exhibit 11, which is up on the screen |
| 10:43:24 | 4 | before you, that's at Tight Ends, correct? |
| 10:43:27 | 5 | A.   That is correct. |
| 10:43:28 | 6 | Q.   Does that depict on their Instagram social media |
| 10:43:34 | 7 | page, a waitress? |
| 10:43:38 | 8 | A.   A what? |
| 10:43:39 | 9 | Q.   A waitress? |
| 10:43:39 | 10 | A.   Yes.  Depicts an entertainer. |
| 10:43:44 | 11 | Q.   Okay.  And what does that entertainer have in her |
| 10:43:46 | 12 | hand? |
| 10:43:47 | 13 | A.   A beer. |
| 10:43:47 | 14 | Q.   Are you -- would you assume -- would it be a rational |
| 10:43:51 | 15 | assumption to make that there is the service of or |
| 10:43:55 | 16 | consumption of alcoholic beverages at Tight Ends? |
| 10:43:58 | 17 | A.   From looking at the picture, yes. |
| 10:44:00 | 18 | Q.   And you've been to Tight Ends, haven't you, and they |
| 10:44:04 | 19 | serve alcoholic beverages? |
| 10:44:05 | 20 | A.   So I know they do, yes. |
| 10:44:07 | 21 | Q.   To two or more persons, correct? |
| 10:44:08 | 22 | A.   I've had one there. |
| 10:44:09 | 23 | Q.   And are the women in there dressed in a state of |
| 10:44:13 | 24 | nudity under the statute? |
| 10:44:14 | 25 | A.   Yes. |

| | | |
|---|---|---|
| 10:44:15 | 1 | Q.   Are their buttocks exposed? |
| 10:44:16 | 2 | A.   Yes. |
| 10:44:17 | 3 | Q.   Are their breasts below the top of the areola |
| 10:44:19 | 4 | exposed? |
| 10:44:20 | 5 | A.   Yes. |
| 10:44:20 | 6 | Q.   And the picture that is on page 2 on Exhibit 11, is |
| 10:44:24 | 7 | her buttocks being exposed? |
| 10:44:31 | 8 | A.   From looking at it, I would assume it is. |
| 10:44:33 | 9 | Q.   And are her breasts below the top of the areola or |
| 10:44:37 | 10 | any portion of her breasts below the top of the areola |
| 10:44:39 | 11 | exposed? |
| 10:44:40 | 12 | A.   Yes, they are. |
| 10:44:40 | 13 | Q.   All right.  Are you familiar with the presumption |
| 10:44:43 | 14 | that's in the rule, the amended rule? |
| 10:44:45 | 15 | A.   Yes. |
| 10:44:46 | 16 | Q.   All right.  And it provides that the comptroller will |
| 10:44:51 | 17 | presume that a business is a sexually oriented business if |
| 10:44:55 | 18 | the business holds itself out as a sexually oriented |
| 10:44:59 | 19 | business.  Evidence the comptroller may consider includes |
| 10:45:03 | 20 | social media, correct? |
| 10:45:04 | 21 | A.   Correct. |
| 10:45:05 | 22 | Q.   So the comptroller can make the presumption against |
| 10:45:07 | 23 | Tight Ends if it wanted or chose to do so under the rule, |
| 10:45:12 | 24 | correct? |
| 10:45:13 | 25 | A.   That is correct. |

10:45:13   1   Q.   And assess a fee for every patron that walks into the

10:45:17   2   front door of $5, correct?

10:45:20   3   A.   That's correct.

10:45:21   4   Q.   All right.  Now, I'd like you to turn to page 6 of

10:45:28   5   Exhibit 11, and, sir, is that from the Twitter page of

10:45:37   6   Tight Ends in Plano, Texas?

10:45:41   7   A.   Yes, it is.

10:45:42   8   Q.   All right.  And what does the picture show?

10:45:44   9   A.   It shows girls in bootie shorts with a shell covering

10:45:53   10   a portion of their areola portion of their breasts.

10:45:58   11   Q.   But is any portion of these three women's breasts

10:46:04   12   below the top of the areola being exposed?

10:46:06   13   A.   Absolutely.

10:46:07   14   Q.   And have you been at this Tight Ends in Plano, Texas?

10:46:11   15   A.   I have.

10:46:11   16   Q.   And when at this Tight Ends in Plano, Texas, have you

10:46:15   17   ever taken any pictures?

10:46:17   18   A.   Yes, I have.

10:46:17   19   Q.   Would you turn to Exhibit 13, please?  Would you

10:46:33   20   thumb through those pictures, please?

10:46:55   21   A.   Okay.

10:46:56   22   Q.   Are you familiar with those pictures?

10:46:58   23   A.   I am.

10:46:58   24   Q.   Did you take them?

10:46:59   25   A.   Yes.

10:46:59  1  Q.   Did you take them on October 2nd, 2019?

10:47:02  2  A.   I did.  I didn't -- I may not have taken all of them.

10:47:05  3  There's three of us there.  But yes.

10:47:08  4  Q.   These pictures were taken on October 2nd, 2019.

10:47:11  5  A.   Correct.  In my presence, if I didn't take them.

10:47:13  6  Q.   On page 1 of Exhibit 13, that was taken at Tight Ends

10:47:19  7  Sports Bar & Grill at Plano, Texas, wasn't it?

10:47:22  8  A.   Absolutely.

10:47:24  9  Q.   And there is -- tell the Court what you see.

10:47:30  10  A.   Do what?

10:47:30  11  Q.   Tell the Court what you see in that picture.

10:47:32  12  A.   Well, you've got a girl sitting there in a bra and a

10:47:36  13  pair of thong panties, exposing her buttocks.  You can't

10:47:40  14  see her front in this picture, but she's also exposing

10:47:43  15  portions of her breasts that would be against the rule,

10:47:49  16  sitting with a customer, having a drink, entertaining.

10:47:54  17  That's why the guys go in there.  It's not the food.

10:47:57  18  Q.   She's clearly not taking an order and going and

10:48:01  19  fetching food for him, is she?

10:48:02  20  A.   No.

10:48:02  21  Q.   What is she doing?

10:48:04  22  A.   Entertaining him, talking to him.

10:48:06  23  Q.   Okay.  Now, if you would, flip back to page -- the

10:48:09  24  ninth page of Exhibit 13.

10:48:24  25  A.   Okay.

| | | |
|---|---|---|
| 10:48:25 | 1 | Q.   Before we get to, specifically, page 9, sir, are |
| 10:48:28 | 2 | these true and accurate pictures of what you saw at the |
| 10:48:34 | 3 | bars on October 2nd, 2019? |
| 10:48:37 | 4 | A.   Yes, sir. |
| 10:48:38 | 5 | Q.   All right.  Your Honor, we would move to admit |
| 10:48:40 | 6 | Exhibit No. 13. |
| 10:48:43 | 7 | MR. ABRAMS:  No objection, your Honor. |
| 10:48:44 | 8 | THE COURT:  Be received. |
| 10:48:52 | 9 | Q.   (BY MR. WALLACE) What does Exhibit -- or the ninth |
| 10:48:54 | 10 | page of Exhibit 13 show? |
| 10:48:56 | 11 | A.   It shows a girl wearing a traditional bikini, |
| 10:49:00 | 12 | triangle bikini.  If you'll look, it's showing on the |
| 10:49:06 | 13 | inside of the breast, it's showing part of the breast |
| 10:49:09 | 14 | below the top of the areola, and if you look at the very |
| 10:49:12 | 15 | bottom of the bikini, there's about an inch, inch and a |
| 10:49:16 | 16 | half of her breast before it actually hits her ribcage |
| 10:49:19 | 17 | body that's also showing. |
| 10:49:22 | 18 | Q.   I'm going to draw on the one that's on the screen. |
| 10:49:24 | 19 | But -- |
| 10:49:25 | 20 | A.   Right. |
| 10:49:25 | 21 | Q.   -- would that portion of her breasts be exposed? |
| 10:49:27 | 22 | A.   Yes. |
| 10:49:29 | 23 | Q.   And what was she doing when you took this picture? |
| 10:49:32 | 24 | A.   Sitting with a customer. |
| 10:49:34 | 25 | Q.   I'm sorry? |

10:49:35  1  A.   Sitting with a customer, talking, entertaining them.

10:49:39  2  Q.   And would you turn to the tenth page of Exhibit 13,

10:49:43  3  please?

10:49:43  4  A.   Yes.

10:49:44  5  Q.   Tell the Court what that depicts, please.

10:49:56  6  A.   It's much clearer when you're looking at the picture,

10:49:59  7  but it's the same girl that was sitting down, I believe,

10:50:01  8  that's wearing the peach-colored bra and thong panties.

10:50:07  9  Q.   Okay.  And last, but not least, the eleventh page and

10:50:10  10  that was at Tight Ends Sports Bar & Grill?

10:50:12  11  A.   Yes, sir.

10:50:13  12  Q.   In Plano, Texas?

10:50:14  13  A.   Yes, sir.

10:50:15  14  Q.   Whose social media shows that they're offering nudity

10:50:20  15  under the statute?

10:50:21  16  A.   Right.

10:50:22  17  Q.   Okay.  So on page -- the eleventh page of Exhibit 13,

10:50:27  18  all right, does that show an entertainer sitting with a

10:50:30  19  customer?

10:50:31  20  A.   Yes.

10:50:31  21  Q.   What is she doing with this customer?  You were

10:50:33  22  there?

10:50:34  23  A.   She's entertaining him.  She's sitting there for a

10:50:36  24  while.  They train their girls when they go up, they may

10:50:39  25  take orders, but to sit with the customer, to have a seat,

| | | |
|---|---|---|
| 10:50:43 | 1 | to talk to them. |
| 10:50:44 | 2 | Q.   For what purpose? |
| 10:50:45 | 3 | A.   To keep them in there, entertain them.  That's why |
| 10:50:48 | 4 | guys come back. |
| 10:50:49 | 5 | Q.   Is that what you did at -- hold on -- Sports City and |
| 10:50:58 | 6 | Sneaky Pete's? |
| 10:50:59 | 7 | A.   To some degree, yes. |
| 10:51:02 | 8 | THE COURT:  So what's the idea?  The idea is to |
| 10:51:05 | 9 | get them to continue to buy alcohol? |
| 10:51:08 | 10 | THE WITNESS:  Alcohol, food, just keep them |
| 10:51:10 | 11 | staying in there, spending money.  Correct. |
| 10:51:13 | 12 | THE COURT:  Do they have to pay a cover charge to |
| 10:51:15 | 13 | sit with the young woman? |
| 10:51:19 | 14 | THE WITNESS:  No.  They do not. |
| 10:51:21 | 15 | Q.   (BY MR. WALLACE) And for the $5 fee statute to apply |
| 10:51:24 | 16 | to an adult cabaret, the adult cabaret is under no |
| 10:51:27 | 17 | requirement to charge a cover charge, right? |
| 10:51:30 | 18 | A.   Correct. |
| 10:51:30 | 19 | Q.   Some of the cabarets throughout Texas don't charge a |
| 10:51:34 | 20 | cover charge, do they? |
| 10:51:34 | 21 | A.   Very true. |
| 10:51:35 | 22 | Q.   While others do. |
| 10:51:37 | 23 | A.   True. |
| 10:51:38 | 24 | Q.   All right.  Now, this was Tight Ends? |
| 10:51:42 | 25 | A.   Correct. |

10:51:43  1   Q.   Sports Bar & Grill.

10:51:46  2   A.   And let me also explain that these girls by doing

10:51:49  3   this, they make a lot more money in tips than a

10:51:53  4   traditional waitress would make at 15 or 20 percent.  And

10:51:58  5   I'm going to tell you, the average is about 12 to 15

10:52:01  6   percent on what a waitress would make on a food service

10:52:04  7   staff.

10:52:16  8           THE COURT:  They don't -- I mean, there's no quid

10:52:18  9   pro quo here.  There's no sex acts allowed, no touching

10:52:21  10  allowed.

10:52:22  11          THE WITNESS:  No.

10:52:23  12          THE COURT:  There's none of that.

10:52:24  13          THE WITNESS:  No.  It's a legitimate -- I mean,

10:52:32  14  there's nothing -- no prostitution.

10:52:35  15          THE COURT:  Legal.

10:52:38  16          THE WITNESS:  Yes, sir.  Other than the fact they

10:52:39  17  don't have a sexually oriented business license to

10:52:43  18  operate.

10:52:44  19  Q.   (BY MR. WALLACE) And there's no sex going on inside

10:52:46  20  your adult cabarets, is there, sir?

10:52:48  21  A.   No.

10:52:49  22  Q.   That would be illegal, right?

10:52:50  23  A.   It would be illegal.

10:52:51  24  Q.   And there's no prostitution going on.

10:52:52  25  A.   Correct.  I could mention one thing, though.  You

10:52:56  1  talked about Sneaky Pete's.  Sneaky Pete's is on the lake

10:52:59  2  and it's lake-generated, and during the summer it's crazy.

10:53:03  3  Not only do the -- during the summer, does the staff wear

10:53:08  4  bikinis, which are going to expose parts of the buttocks

10:53:14  5  and area.  You have customers coming in on their boats

10:53:17  6  from what they call party cove, which is just a crazy

10:53:22  7  place on Lake Lewisville, come in to eat, drink, we have a

10:53:25  8  pool, we have a band, and the customers, girls would jump

10:53:29  9  up on the tables and they'd start dancing, customers.  I

10:53:32  10  mean, they're dancing, they're entertaining.  They're not

10:53:35  11  part of our staff, but they're in there and they're in

10:53:39  12  thong bikinis, many of them.

10:53:42  13  Q.  On October 2nd, 2019, did you go to Knockout Sports

10:53:46  14  Bar in Dallas, Texas?

10:53:47  15  A.  I did.

10:53:48  16  Q.  And did you take photographs?

10:53:49  17  A.  I did.

10:53:50  18  Q.  And if you'll turn to page 2 of Exhibit 13.

10:53:56  19  A.  Yes.

10:53:56  20  Q.  Was this one of the entertainers that you came across

10:54:00  21  there?

10:54:00  22  A.  Yes.

10:54:01  23  Q.  All right.  Is her buttocks exposed?

10:54:03  24  A.  It is.

10:54:06  25  Q.  Were there two or more people present?

| | | |
|---|---|---|
| 10:54:07 | 1 | A.   There were. |
| 10:54:08 | 2 | Q.   Was there entertainment being provided? |
| 10:54:10 | 3 | A.   There was. |
| 10:54:10 | 4 | Q.   Was that nude entertainment? |
| 10:54:12 | 5 | A.   Yes. |
| 10:54:13 | 6 | Q.   Was alcohol being consumed? |
| 10:54:14 | 7 | A.   Yes. |
| 10:54:15 | 8 | Q.   And if you'll turn to page 3 of -- the third page of |
| 10:54:23 | 9 | Exhibit 13. |
| 10:54:23 | 10 | A.   Correct. |
| 10:54:24 | 11 | Q.   All right.  Who's depicted in that picture? |
| 10:54:31 | 12 | A.   The girl that you are seeing the back of and Mr. |
| 10:54:34 | 13 | Langan. |
| 10:54:36 | 14 | Q.   Mr. Langan here in the courtroom with us today? |
| 10:54:38 | 15 | A.   Correct. |
| 10:54:39 | 16 | THE COURT:  I might have the wrong picture here. |
| 10:54:41 | 17 | THE WITNESS:  No.  That one right there. |
| 10:54:42 | 18 | THE COURT:  This is the picture. |
| 10:54:43 | 19 | THE WITNESS:  Yes, sir. |
| 10:54:45 | 20 | THE COURT:  I don't see his back.  I see his |
| 10:54:47 | 21 | front. |
| 10:54:47 | 22 | THE WITNESS:  No.  It's the same girl that we saw |
| 10:54:49 | 23 | the back of on the previous page. |
| 10:54:50 | 24 | THE COURT:  Oh, I see. |
| 10:54:52 | 25 | THE WITNESS:  It's the same girl. |

10:54:53    1            THE COURT:  I thought you were telling me Mr.

10:54:56    2   Langan's back.  I was saying, what?

10:54:59    3   Q.   (BY MR. WALLACE) But in that picture is Mr. Langan

10:55:02    4   who's here in the courtroom today.

10:55:04    5   A.   Yes.

10:55:04    6   Q.   Okay.  And is this woman's breasts below the top of

10:55:08    7   the areola exposed?

10:55:09    8   A.   Yes.

10:55:10    9   Q.   And did you -- do you know where this woman works

10:55:18   10   other than Knockout Sports Bar?

10:55:20   11   A.   Yes.

10:55:20   12   Q.   Where?

10:55:21   13   A.   Baby Dolls Saloon.

10:55:23   14   Q.   The club you own or are president of?

10:55:26   15   A.   Correct.

10:55:29   16   Q.   Is this the same kind of outfit that she could wear

10:55:32   17   while entertaining at Baby Dolls?

10:55:36   18   A.   She could.  We suggest when they're on the floor,

10:55:41   19   walking around, that they wear more clothing than that.

10:55:45   20   They're independent contractors, so we can't force them.

10:55:47   21   We suggest that they put on more clothes on the floor and

10:55:51   22   leave the stripping down to when they get on stage or

10:55:57   23   doing a table dance.  But yes, she could.

10:56:00   24   Q.   Now, I notice in the bottom of the picture, you can't

10:56:05   25   see it very well on the screen, but what's in this woman's

```
10:56:07   1  hand?
10:56:07   2  A.   A $20 bill.
10:56:08   3  Q.   Do you know where she got that $20?
10:56:10   4  A.   Where she got it?
10:56:11   5  Q.   Yes.
10:56:11   6  A.   From Eric.
10:56:12   7  Q.   From Mr. Langan?
10:56:13   8  A.   Yes.
10:56:14   9  Q.   Did Mr. Langan have to pay her in order to take a
10:56:17  10  photograph?
10:56:17  11  A.   She's an entertainer, of course.  That's the girls
10:56:20  12  that work here, they serve, but they entertain.  And yes,
10:56:23  13  that's for $20, you can take her picture.
10:56:26  14  Q.   That's how they make money, right?
10:56:29  15  A.   Absolutely.
10:56:29  16  Q.   Like getting a dance at a topless club for $20,
10:56:33  17  right?
10:56:33  18  A.   Traditional dances at clubs would be $20.  Correct.
10:56:38  19  Q.   But at Knockout Sports Bar & Grill, for $20, you get
10:56:42  20  a picture.
10:56:43  21  A.   Sure.
10:56:43  22  Q.   From an entertainer.
10:56:44  23  A.   Yeah.
10:56:45  24  Q.   Who's nude.
10:56:46  25  A.   Correct.  Probably -- she'd probably sit for you
```

| | | |
|---|---|---|
| 10:56:52 | 1 | longer for another 20, or another 20, or you're buying her |
| 10:56:56 | 2 | time.  She's entertaining. |
| 10:56:58 | 3 | Q.   Did you go to Wild Pitch Sports Bar & Grill? |
| 10:57:02 | 4 | A.   Yes, we did. |
| 10:57:03 | 5 | Q.   In Frisco, Texas? |
| 10:57:05 | 6 | A.   Yes, we did. |
| 10:57:06 | 7 | Q.   You took pictures? |
| 10:57:07 | 8 | A.   Yes. |
| 10:57:07 | 9 | Q.   I'll show you one.  I don't know how well it will |
| 10:57:10 | 10 | show up on the screen, but can you tell the Judge what |
| 10:57:12 | 11 | these women are wearing? |
| 10:57:15 | 12 | A.   They're wearing basically a thong bottom and a |
| 10:57:21 | 13 | bra-like top, which exposes a portion of the breasts below |
| 10:57:23 | 14 | the top of the areola and the bottom.  Kind of hard to |
| 10:57:26 | 15 | tell.  I was there, so I can tell you, it's definitely a |
| 10:57:30 | 16 | thong-type bottom, which exposes the majority of the |
| 10:57:33 | 17 | buttocks. |
| 10:57:34 | 18 | Q.   And on the fourth page of Exhibit 13, are they |
| 10:57:36 | 19 | wearing something on their back?  Can you tell? |
| 10:57:40 | 20 | A.   Yeah.  They have wings on like I took it as a take on |
| 10:57:47 | 21 | Victoria's Secret models.  They had wings on, but they |
| 10:57:51 | 22 | were black wings, so they were the bad angels, I guess. |
| 10:57:55 | 23 | Q.   And they're sitting at the table.  These two ladies |
| 10:57:57 | 24 | are sitting at the table with a customer. |
| 10:58:00 | 25 | A.   And drinking. |

10:58:01  1   Q.   And drinking.  Do you ever see them serve any food to

10:58:04  2   this man?

10:58:04  3   A.   Not at the time I was in there.  Not looking at these

10:58:09  4   girls.

10:58:09  5   Q.   What were they doing?

10:58:10  6   A.   Sitting there, talking and just entertaining, and

10:58:13  7   laughing, telling jokes, I mean, just going back and

10:58:17  8   forth, having fun.

10:58:19  9   Q.   Wearing a costume?

10:58:20  10  A.   Making money.

10:58:24  11  Q.   And if you look at page 5 of Exhibit 13 or the fifth

10:58:29  12  page of Exhibit 13.

10:58:30  13  A.   Yes.

10:58:30  14  Q.   Is that a picture also taken at Wild Pitch Sports Bar

10:58:34  15  & Grill?

10:58:34  16  A.   Yes.

10:58:34  17  Q.   Same thing with page 6 and the sixth page and the

10:58:39  18  seventh page of Exhibit 13, those were taken at Wild Pitch

10:58:43  19  Sports Bar & Grill?

10:58:43  20  A.   Yes, they were.

10:58:45  21  Q.   Last, but not least, and I'll end this, did you go to

10:58:48  22  Ojos Locos?

10:58:49  23  A.   I did.  I actually go there for lunch quite a bit

10:58:58  24  because it's not too far from our office, and they do have

10:59:01  25  good food.

10:59:02   1   Q.   And was that at Dallas, Texas?

10:59:06   2   A.   It is.

10:59:07   3   Q.   Did you see people there who had exposed buttocks?

10:59:10   4   A.   Yes.

10:59:11   5   Q.   Did you see people there with breasts exposed below

10:59:15   6   the top of their areola?

10:59:16   7   A.   Yes.

10:59:17   8   Q.   Were there more than 40 people present?

10:59:20   9   A.   Yes.

10:59:20   10   Q.   And were you there for lunch?

10:59:22   11   A.   Yes.

10:59:22   12   Q.   How many, if you remember, were women?

10:59:27   13   A.   As far as customers?

10:59:29   14   Q.   Yes.

10:59:29   15   A.   Counted two.

10:59:30   16   Q.   Everybody else was a man, right?

10:59:32   17   A.   Correct.

10:59:32   18   Q.   Were they being entertained by these women who were

10:59:36   19   scantily clad?

10:59:37   20   A.   Virtually, every table had girls sitting at it for

10:59:43   21   extended periods, at one time or another.

10:59:48   22   Q.   You've been in this business how long, sir?

10:59:51   23   A.   Since 1987.

10:59:53   24   Q.   If at these restaurants that we've talked about

10:59:57   25   today, Ojos Locas, Wild Pitch Sports Bar & Grill, Tight

| | | |
|---|---|---|
| 11:00:03 | 1 | Ends Sports Bar & Grill, Knockout Sports Bar, if their |
| 11:00:11 | 2 | waiters or other persons were people -- were men dressed |
| 11:00:18 | 3 | like me, from your experience in this business, how long |
| 11:00:24 | 4 | would their doors be open? |
| 11:00:28 | 5 | A.   If men dressed like you are the servers? |
| 11:00:32 | 6 | Q.   Yes. |
| 11:00:33 | 7 | A.   I'm not sure they would open, but not very long. |
| 11:00:37 | 8 | Q.   They're generating income from the fact that they |
| 11:00:43 | 9 | provide personnel who are nude or seminude under the |
| 11:00:50 | 10 | statute, correct? |
| 11:00:50 | 11 | A.   The whole concept is to serve food and alcohol and |
| 11:00:54 | 12 | have pretty girls that are friendly that will sit down and |
| 11:00:57 | 13 | talk to you. |
| 11:00:59 | 14 | Q.   And are they providing, from your perspective in this |
| 11:01:02 | 15 | business, entertainment? |
| 11:01:04 | 16 | A.   Sure.  Not just entertainment at the table, but you |
| 11:01:06 | 17 | will see, they'll -- certain songs will come on and |
| 11:01:11 | 18 | they'll all stand up and dance.  They'll do a |
| 11:01:13 | 19 | choreographed dance.  They'll jump on the bar, the table. |
| 11:01:16 | 20 | They'll have hoo-la-hoops and they'll have a hoo-la-hoop |
| 11:01:20 | 21 | contest.  Sometimes get the crowd -- a guy from the crowd |
| 11:01:22 | 22 | get up there, get interactive. |
| 11:01:28 | 23 | So yes, it's an entertainment place for guys |
| 11:01:30 | 24 | where they can go and eat and feel special. |
| 11:01:34 | 25 | Q.   Real quickly, let's go back to Exhibit 12, please, |

| | | |
|---|---|---|
| 11:01:37 | 1 | and to your visit at Tight Ends Sports Bar & Grill.  Is |
| 11:02:01 | 2 | this something you took from the sports bar? |
| 11:02:03 | 3 | A.   It is. |
| 11:02:04 | 4 | Q.   Is that how the women are actually clad? |
| 11:02:11 | 5 | A.   That's a good depiction.  Some have less clothing on |
| 11:02:15 | 6 | the top than a crop T-shirt, and some of the bottoms are |
| 11:02:20 | 7 | smaller than this, and some maybe a little larger.  That's |
| 11:02:24 | 8 | a good depiction.  Yes. |
| 11:02:39 | 9 | Q.   In previous testimony, including affidavit testimony |
| 11:02:44 | 10 | and deposition testimony in this case, you have said that |
| 11:02:47 | 11 | the $5 fee statute is being arbitrarily enforced against |
| 11:02:51 | 12 | adult cabarets, correct? |
| 11:02:52 | 13 | A.   That's correct. |
| 11:02:54 | 14 | Q.   All right.  And I believe that you said that it is |
| 11:02:59 | 15 | not being enforced against concert venues, places like NRG |
| 11:03:05 | 16 | Stadium where Beyonce performs, breastraunts like Tight |
| 11:03:12 | 17 | Ends and Wild Pitch and burlesque shows; is that correct? |
| 11:03:14 | 18 | MR. ABRAMS:  Objection.  Foundation. |
| 11:03:16 | 19 | MR. WALLACE:  I'm asking if that was his previous |
| 11:03:18 | 20 | testimony. |
| 11:03:18 | 21 | THE COURT:  Overruled. |
| 11:03:20 | 22 | A.   Yes. |
| 11:03:21 | 23 | Q.   (BY MR. WALLACE) Okay.  Now, what is the basis of |
| 11:03:23 | 24 | your opinion that it is being assessed against cabarets |
| 11:03:26 | 25 | and not other bars, restaurants, or similarly situated |

| | | |
|---|---|---|
| 11:03:35 | 1 | commercial enterprises? |
| 11:03:36 | 2 | A.   What is my -- |
| 11:03:38 | 3 | Q.   What's the basis of your opinion that it's being |
| 11:03:40 | 4 | assessed against cabarets and not other bars, restaurants |
| 11:03:44 | 5 | and similarly situated businesses? |
| 11:03:46 | 6 | A.   Well, I think the whole rule was adopted to target |
| 11:03:50 | 7 | cabarets.  It's clear if you read the rule, when they say |
| 11:03:53 | 8 | what you can't wear for clothing, no one wears foam, no |
| 11:03:58 | 9 | one wears wax.  Latex is the only thing that I know that |
| 11:04:02 | 10 | people will wear to cover up.  Why would the other stuff |
| 11:04:05 | 11 | be in there and they say latex if they weren't targeting |
| 11:04:10 | 12 | cabarets? |
| 11:04:10 | 13 | Q.   Do you speak with owners, managers and folks who are |
| 11:04:17 | 14 | associated with these other places like Tight Ends? |
| 11:04:23 | 15 |         MR. ABRAMS:  Objection.  Hearsay. |
| 11:04:24 | 16 |         THE COURT:  Sustained. |
| 11:04:26 | 17 |         MR. WALLACE:  I'm not asking what they said, your |
| 11:04:28 | 18 | Honor. |
| 11:04:28 | 19 | Q.   (BY MR. WALLACE) Do you speak with them? |
| 11:04:30 | 20 | A.   Yes. |
| 11:04:30 | 21 | Q.   Do you have association meetings with them? |
| 11:04:33 | 22 | A.   Yes.  We're -- I am and have been members of the |
| 11:04:39 | 23 | Texas Restaurant Association, the local restaurant |
| 11:04:42 | 24 | association, the TEA.  There's many different trade |
| 11:04:45 | 25 | organizations that we're involved with that we would go |

| | | |
|---|---|---|
| 11:04:50 | 1 | to, we meet, we network, and we interchange this |
| 11:04:54 | 2 | information back and forth.  I'm going to tell you, they |
| 11:04:57 | 3 | are scared to death that this is going to be enforced -- |
| 11:05:00 | 4 | MR. ABRAMS:  Objection to the extent it's going |
| 11:05:02 | 5 | to hearsay. |
| 11:05:02 | 6 | THE COURT:  Sustained. |
| 11:05:03 | 7 | Q.  (BY MR. WALLACE) Have you reviewed -- you're familiar |
| 11:05:07 | 8 | with the fact that an entity who has asked for a |
| 11:05:11 | 9 | redetermination can have a hearing before an |
| 11:05:13 | 10 | administrative law judge at the State Office of |
| 11:05:16 | 11 | Administrative Hearings, correct? |
| 11:05:17 | 12 | A.  Correct. |
| 11:05:17 | 13 | Q.  And that the administrative law judge issues |
| 11:05:22 | 14 | proposals for decisions, correct? |
| 11:05:23 | 15 | A.  Correct. |
| 11:05:24 | 16 | Q.  Have you reviewed proposals for decisions that relate |
| 11:05:27 | 17 | to the assessment of the $5 fee? |
| 11:05:29 | 18 | A.  I have. |
| 11:05:30 | 19 | Q.  And how many? |
| 11:05:37 | 20 | A.  Scores of them. |
| 11:05:38 | 21 | Q.  Scores of them.  Were any of them that you reviewed |
| 11:05:44 | 22 | deal with anything other than an adult cabaret? |
| 11:05:49 | 23 | A.  No. |
| 11:05:50 | 24 | Q.  Did any of them deal with something like Tight Ends, |
| 11:05:55 | 25 | or NRG Stadium, or Warehouse Live, or Twin Peaks? |

```
11:06:05  1   A.   No.
11:06:06  2   Q.   Are all of those places I just named providing for an
11:06:15  3   audience two or more, nude entertainment as defined in the
11:06:18  4   statute and under the amended rule while the consumption
11:06:21  5   of alcohol is present?
11:06:23  6              MR. ABRAMS:  Objection.  It seems to call for a
11:06:26  7   legal conclusion.
11:06:26  8              THE COURT:  I agree.  Objection is sustained.
11:06:30  9   Q.   (BY MR. WALLACE) With respect to Ojos Locos, Knockout
11:06:45  10  Sports Bar, Wild Pitch Sports Bar & Grill, the Tight Ends
11:06:50  11  Sports Bar & Grill, are they providing nude entertainment
11:06:54  12  as defined in the statute?
11:06:55  13             MR. ABRAMS:  Again, objection.  Calls for a legal
11:06:57  14  conclusion.
11:07:03  15             THE COURT:  A legal conclusion?
11:07:04  16             MR. ABRAMS:  Yes.  He's asking do they provide
11:07:06  17  nude entertainment as called for in the statute.  He's
11:07:08  18  asking the witness to testify as to --
11:07:11  19             THE COURT:  Well, I would agree with you.  It's
11:07:13  20  very difficult to do that in light of the fact that it
11:07:15  21  says, and similarly situated businesses, I don't know what
11:07:18  22  we're talking about.  Are we talking about Hooters here?
11:07:21  23  Is Hooters an adult entertainment forum under this
11:07:24  24  statute?  Is it?  Would Hooters be covered?
11:07:30  25             MR. ABRAMS:  I believe so.  But.
```

11:07:31  1          THE COURT:  You think so?

11:07:32  2          MR. ABRAMS:  I believe.  I mean, I don't know.

11:07:36  3  But I was just objecting to the extent it's calling for a

11:07:40  4  legal conclusion.

11:07:40  5          THE COURT:  Well, I think you're actually right.

11:07:44  6  I think it probably does call for him to be commenting

11:07:47  7  along the statute.  He can certainly testify about what he

11:07:51  8  as an operator of these businesses could be concerned

11:08:00  9  about.  But he can't testify as to what actually is the

11:08:06  10  four corners of the statute.

11:08:08  11  Q.  (BY MR. WALLACE) Let me ask it a different way.  Ojos

11:08:12  12  Locas, Knockout Sports Bar, Wild Pitch, Tight Ends, are

11:08:17  13  there entertainers present that are exposing their

11:08:24  14  buttocks and portions of their breasts below the top of

11:08:28  15  the areola?

11:08:28  16  A.  Yes, sir.

11:08:31  17  Q.  Are they serving alcohol?

11:08:33  18  A.  Yes, they are.

11:08:33  19  Q.  Are there two or more people present?

11:08:37  20  A.  Absolutely.

11:08:37  21  Q.  And is there entertainment going on?

11:08:40  22  A.  Yes.

11:08:44  23  Q.  And you have personal knowledge of that?

11:08:46  24  A.  I do.

11:08:57  25  Q.  Was that same kind of entertainment being provided at

11:09:04  1  -- when you were involved with Sports City and Sneaky

11:09:07  2  Pete's back in early 2017?

11:09:09  3  A.   To some degree, yes.

11:09:10  4  Q.   At any time, did the comptroller assess Sneaky Pete's

11:09:15  5  or Sports City with a $5 fee assessment?

11:09:17  6  A.   No.

11:09:20  7  Q.   Nor did they assess the $5 fee assessment to any of

11:09:24  8  the entities in the scores of proposals for decisions you

11:09:29  9  reviewed, correct?

11:09:30  10  A.   Correct.

11:09:31  11  Q.   All right.  After talking with folks, after being --

11:09:41  12  that are involved in what -- the entities like Wild Pitch

11:09:49  13  and like Tight Ends, after being in this industry for all

11:10:03  14  these years, after reading the PFDs, have you formed an

11:10:08  15  opinion as to whether or not the comptroller is

11:10:12  16  arbitrarily enforcing the $5 fee statute against adult

11:10:15  17  cabarets and not enforcing it against these other

11:10:18  18  entities?

11:10:19  19       MR. ABRAMS:  Objection.  Calls for a legal

11:10:21  20  conclusion.

11:10:22  21       THE COURT:  Sustained.

11:10:24  22       MR. WALLACE:  Judge, I'm asking for his

11:10:26  23  perception.

11:10:27  24       THE COURT:  Well, you need to lay more

11:10:31  25  foundation.

11:10:31  1   Q.   (BY MR. WALLACE) Okay.  Do you know of any entity

11:10:35  2   other than an adult cabaret to whom the $5 fee has been

11:10:41  3   assessed by the Texas State Comptroller?

11:10:48  4   A.   No.

11:10:50  5   Q.   And you have wide involvement with clubs, businesses,

11:10:57  6   sports bars, adult cabarets and non-adult cabarets

11:11:00  7   throughout Texas, correct?

11:11:01  8   A.   Correct.  The only thing I would say is, some latex

11:11:06  9   clubs that were outside of the scope, they've tried to

11:11:10  10  enforce against them, but those are cabarets.

11:11:48  11        MR. WALLACE:  If I can have just a minute, your

11:11:50  12  Honor, I'll try to shorten up what I'm doing here.

11:12:39  13  Q.   (BY MR. WALLACE) Mr. Craft, are you familiar with an

11:12:43  14  entity known as WL York, Inc?

11:12:50  15  A.   Yeah.  That -- I'm trying to think where it is.  I'm

11:12:55  16  familiar with the corporate name.

11:12:56  17  Q.   Well, let me ask you this.  Are you familiar with an

11:13:01  18  adult cabaret called Centerfolds?

11:13:05  19  A.   Yes.

11:13:05  20  Q.   And where is that located?

11:13:06  21  A.   In Houston, Texas.

11:13:07  22  Q.   All right.  And you're familiar with that business?

11:13:09  23  A.   Yes.

11:13:11  24  Q.   Okay.  Can you identify what that is, sir?

11:14:30  25        MR. ABRAMS:  Mr. Wallace, have you produced this

| | | |
|---|---|---|
| 11:14:33 | 1 | to us? |
| 11:14:35 | 2 | MR. WALLACE:  These are your documents. |
| 11:14:40 | 3 | MR. ABRAMS:  Did we produce them to you? |
| 11:14:42 | 4 | MR. WALLACE:  Yeah.  These came from the Office |
| 11:14:44 | 5 | of the State Comptroller. |
| 11:14:49 | 6 | MR. ABRAMS:  Did they produce in this case? |
| 11:14:56 | 7 | We've never seen this. |
| 11:14:57 | 8 | MR. WALLACE:  I believe it was in this case.  I |
| 11:14:59 | 9 | don't have the Bates numbers. |
| 11:15:06 | 10 | MR. ABRAMS:  When were they produced? |
| 11:15:08 | 11 | MS. HARGIS:  These were not part of the |
| 11:15:09 | 12 | discovery? |
| 11:15:58 | 13 | Q.  (BY MR. WALLACE) Let me ask, do you know what this |
| 11:15:59 | 14 | is? |
| 11:15:59 | 15 | A.  Yes. |
| 11:15:59 | 16 | Q.  What is it? |
| 11:16:00 | 17 | A.  It's SOB assessment for Centerfolds for the first, |
| 11:16:04 | 18 | second, third and fourth quarters of 2009, 2010, and the |
| 11:16:09 | 19 | first quarter and second quarter, I believe, of 2011. |
| 11:16:15 | 20 | Q.  And these are quarter-by-quarter tax assessments |
| 11:16:18 | 21 | against WL York for the sexually oriented business fee, |
| 11:16:22 | 22 | correct? |
| 11:16:22 | 23 | A.  Correct. |
| 11:16:23 | 24 | Q.  And let's just look at the first page, the estimated |
| 11:16:29 | 25 | tax is 55,125, correct? |

11:16:31  1   A.   That is correct.

11:16:32  2          MR. ABRAMS:  Your Honor, just for the record,

11:16:33  3   we'd like to object that we've never seen this document

11:16:35  4   before and it wasn't produced in discovery.  Just to make

11:16:38  5   that objection for the record.

11:16:39  6          THE COURT:  What is it?

11:16:40  7          MR. WALLACE:  These are the tax assessments

11:16:41  8   issued by the Texas State Comptroller, the party who is a

11:16:45  9   defendant in this case, to an entity called WL York, Inc.,

11:16:49  10  doing business as Centerfolds.

11:16:52  11         THE COURT:  But why weren't they produced?  Where

11:16:56  12  did you get them?

11:16:57  13         MR. WALLACE:  I got them from WL York, Inc., a

11:17:00  14  member of the Texas Entertainment Association.

11:17:04  15         THE COURT:  I see.

11:17:05  16         MR. ABRAMS:  We did not see this document.  The

11:17:07  17  production was made in March of '18, and this document is

11:17:10  18  dated June of 2018.

11:17:10  19         THE COURT:  Is there any concern about the

11:17:12  20  authenticity of the document?

11:17:15  21         MR. ABRAMS:  We'd like a chance to review it and

11:17:18  22  make a determination.

11:17:19  23         THE COURT:  All right.  I'm going to withhold

11:17:22  24  admission of the document until they have a chance to look

11:17:24  25  at it carefully.

| | | |
|---|---|---|
| 11:17:25 | 1 | MR. WALLACE:  Could we take just a break for |
| 11:17:27 | 2 | maybe a couple of minutes while they have a review? |
| 11:17:30 | 3 | THE COURT:  Well, I guess we could take an early |
| 11:17:33 | 4 | lunch.  Let's take an early lunch.  That will give you a |
| 11:17:35 | 5 | chance to look at it, okay? |
| 11:17:37 | 6 | MR. ABRAMS:  Thank you, your Honor. |
| 11:17:38 | 7 | THE COURT:  All right.  We could stand in recess. |
| 11:17:48 | 8 | We'll return at about 1:15 or so, if assuming we have |
| 11:17:52 | 9 | everything. |
| 13:10:20 | 10 | (Lunch recess.) |
| 13:20:57 | 11 | THE COURT:  All right.  The Court would note the |
| 13:21:04 | 12 | presence of all counsel. |
| 13:21:07 | 13 | Sir, you remain under oath. |
| 13:21:11 | 14 | THE WITNESS:  Yes, sir. |
| 13:21:13 | 15 | THE COURT:  You may continue. |
| 13:21:13 | 16 | MR. WALLACE:  Thank you, your Honor. |
| 13:21:14 | 17 | Before our break, I had marked something as |
| 13:21:18 | 18 | Exhibit No. 31.  I'm going to withdraw that offer and move |
| 13:21:23 | 19 | on to a completely different subject. |
| 13:21:25 | 20 | THE COURT:  All right. |
| 13:21:29 | 21 | Q.  (BY MR. WALLACE) Mr. Craft, are you familiar with an |
| 13:21:42 | 22 | entity known as JAI Dining Services Odessa II, Inc? |
| 13:21:51 | 23 | A.  Yes, sir. |
| 13:21:51 | 24 | Q.  And that is a -- what kind of club is that? |
| 13:21:58 | 25 | A.  It's a adult club, cabaret in Odessa. |

| | | |
|---|---|---|
| 13:22:02 | 1 | Q.   Do you know how they attire themselves? |
| 13:22:06 | 2 | A.   They were in shorts, latex and bikini tops. |
| 13:22:25 | 3 | Q.   I'm going to show you what's been previously marked |
| 13:22:27 | 4 | as an exhibit.  Did they wear -- what kind of shorts did |
| 13:22:31 | 5 | they wear? |
| 13:22:32 | 6 | A.   Boy shorts. |
| 13:22:33 | 7 | Q.   Like that in Exhibit 30? |
| 13:22:35 | 8 | A.   Yes, sir. |
| 13:22:35 | 9 | Q.   And you said what did they do about their tops? |
| 13:22:38 | 10 | A.   They wore latex and they wore bikini tops over the |
| 13:22:42 | 11 | latex. |
| 13:22:43 | 12 | Q.   Both? |
| 13:22:43 | 13 | A.   Both. |
| 13:22:44 | 14 | Q.   And what kind of bikini top was it? |
| 13:22:48 | 15 | A.   Your traditional top -- bikini top that you would go |
| 13:22:52 | 16 | to the store and buy.  Full coverage.  It wasn't the |
| 13:22:57 | 17 | skimpy triangle.  It was a full bikini top. |
| 13:23:01 | 18 | Q.   Well, if they didn't have the latex underneath that, |
| 13:23:05 | 19 | would it have exposed a portion -- a side portion of their |
| 13:23:09 | 20 | breast below the top of the areola? |
| 13:23:10 | 21 | A.   As I said, that's always a chance because bikini tops |
| 13:23:18 | 22 | can move around. |
| 13:23:19 | 23 | Q.   I am going to mark what -- |
| 13:23:21 | 24 |         THE COURT:  So they had the latex covering, and |
| 13:23:23 | 25 | then, they had a bikini top on top of the latex? |

| 13:23:27 | 1 | THE WITNESS:  Yes, sir. |

13:23:27    1            THE WITNESS:  Yes, sir.

13:23:28    2            THE COURT:  Okay.

13:23:29    3  Q.   (BY MR. WALLACE) Do you know in this industry why

13:23:32    4  some clubs choose to do that?

13:23:34    5  A.   Excuse me?

13:23:34    6  Q.   Do you know in this industry why some clubs choose to

13:23:39    7  do both latex and a bikini top?

13:23:40    8  A.   Just as a second layer of defense.

13:23:43    9  Q.   Is it possible for a dancer who has been told "don't

13:23:48   10  take your top off" to get involved in a dance with a

13:23:51   11  customer and move their bikini top to the side so that

13:23:55   12  they could show their breast?

13:23:56   13  A.   Either on purpose or accidently, yes, sir.

13:23:58   14  Q.   Well, that happens in some clubs, doesn't it?

13:24:01   15  A.   Yes, sir.

13:24:01   16  Q.   And they expose their breasts when the club has told

13:24:04   17  them not to expose their breasts?

13:24:06   18  A.   Correct.

13:24:07   19  Q.   And so, when doing both, it's kind of a failsafe?

13:24:09   20  A.   Yes, sir.

13:24:10   21  Q.   I'm going to now mark as Exhibit No. 31, an August

13:24:18   22  9th, 2019 comptroller decision, and the accompanying

13:24:27   23  proposal for decision from Administrative Law Judge Trevor

13:24:30   24  Moore, and ask that it be admitted as Exhibit No. 31.

13:24:37   25            MR. ABRAMS:  No objection.

| | | |
|---|---|---|
| 13:24:38 | 1 | THE COURT:  It will be received. |
| 13:24:40 | 2 | Q.  (BY MR. WALLACE) May I approach the witness, your |
| 13:24:43 | 3 | Honor? |
| 13:24:43 | 4 | THE COURT:  You may. |
| 13:24:44 | 5 | Q.  (BY MR. WALLACE) Mr. Craft, you've seen this proposal |
| 13:24:55 | 6 | for decision, have you not? |
| 13:24:56 | 7 | A.  Yes, sir. |
| 13:24:56 | 8 | Q.  And you've seen the comptroller's decision? |
| 13:24:58 | 9 | A.  Yes, sir. |
| 13:24:59 | 10 | Q.  After the administrative -- let me back up. |
| 13:25:03 | 11 | The Texas Comptroller assessed JAI Dining |
| 13:25:11 | 12 | Services, Inc. Odessa -- let me start over. |
| 13:25:16 | 13 | The comptroller assessed JAI Dining Services |
| 13:25:20 | 14 | Odessa, II, Inc. with fees under the SOB fee statute, |
| 13:25:31 | 15 | correct? |
| 13:25:32 | 16 | A.  That is correct. |
| 13:25:33 | 17 | Q.  In the sum of hundreds of thousands of dollars, |
| 13:25:36 | 18 | correct? |
| 13:25:36 | 19 | A.  Yes, sir. |
| 13:25:37 | 20 | Q.  And Odessa II asked for a redetermination? |
| 13:25:40 | 21 | A.  Yes, sir. |
| 13:25:40 | 22 | Q.  They went to the administrative law judge and had a |
| 13:25:43 | 23 | full evidentiary hearing, correct? |
| 13:25:44 | 24 | A.  They did. |
| 13:25:45 | 25 | Q.  And what did the administrative law judge determine? |

13:25:47  1  A.   They determined they were not a sexually oriented

13:25:51  2  business.

13:25:51  3  Q.   Go to the last page of Exhibit No. 31, please.  And

13:26:11  4  finding No. 13.

13:26:13  5  A.   Yes.

13:26:13  6  Q.   Please read it out loud.

13:26:15  7  A.   The greater weight of petitioner's evidence

13:26:17  8  demonstrates that Rick's did not operate as a sexually

13:26:22  9  oriented business during the assessed period.

13:26:24  10  Q.   That's during the assessment period, correct?

13:26:27  11  A.   I'm sorry, assessment period, yes.

13:26:28  12  Q.   And was that assessment period both before the new

13:26:31  13  rule went into effect and after the new rule went into

13:26:35  14  effect?

13:26:35  15  A.   That is correct.

13:26:36  16  Q.   And the Court determined they weren't -- the

13:26:38  17  administrative law judge found they were not a sexually

13:26:42  18  oriented business, correct?

13:26:43  19  A.   That is correct.

13:26:43  20  Q.   Now, if you'll turn back to the first page.  And if

13:26:49  21  -- that's the comptroller's decision?

13:26:53  22  A.   Yes.

13:26:54  23  Q.   And the comptroller adopted what the administrative

13:26:56  24  law judge found, correct?

13:26:58  25  A.   That is correct.

| | | |
|---|---|---|
| 13:26:59 | 1 | Q.   And that was done on July 15th, 2019? |
| 13:27:03 | 2 | A.   Correct. |
| 13:27:03 | 3 | Q.   Signed by Lisa Craven, the deputy comptroller? |
| 13:27:06 | 4 | A.   Yes. |
| 13:27:08 | 5 | Q.   Your Honor, I'll pass the witness. |
| 13:27:25 | 6 | CROSS-EXAMINATION |
| 13:27:25 | 7 | BY MR. ABRAMS: |
| 13:27:46 | 8 | Q.   Good afternoon, Mr. Craft. |
| 13:27:50 | 9 | A.   How are you? |
| 13:27:51 | 10 | Q.   I'm good.  Thank you. |
| 13:27:52 | 11 | Mr. Craft, for purposes of the record, I'll be |
| 13:27:57 | 12 | referring to when the amended rule was enacted, and that |
| 13:28:00 | 13 | was in January of 2017, correct? |
| 13:28:02 | 14 | A.   That's correct. |
| 13:28:04 | 15 | Q.   Mr. Craft, you mentioned attending a Beyonce concert |
| 13:28:11 | 16 | at NRG Stadium. |
| 13:28:12 | 17 | A.   Correct. |
| 13:28:13 | 18 | Q.   When was that? |
| 13:28:14 | 19 | A.   That was September of 2018, I believe.  2018 for |
| 13:28:20 | 20 | sure. |
| 13:28:23 | 21 | Q.   Mr. Craft, you haven't reviewed tax records that -- |
| 13:28:30 | 22 | from NRG Stadium that show whether or not it was assessed |
| 13:28:33 | 23 | an SOB fee, correct? |
| 13:28:34 | 24 | A.   I have not. |
| 13:28:35 | 25 | Q.   And with respect to Beyonce, you haven't reviewed her |

13:28:39  1   tax records to determine whether she was assessed an SOB

13:28:43  2   fee, right?

13:28:45  3   A.   I have not.   That would probably be my wife doing

13:28:47  4   that.   She's a Beyonce fan.

13:28:49  5   Q.   But you personally have not?

13:28:51  6   A.   I have not.

13:28:51  7   Q.   And, Mr. Craft, are you aware of how many enforcement

13:28:55  8   officers the comptroller employs?

13:28:58  9   A.   I'm not.

13:28:59 10   Q.   So you weren't aware of the amount of resources that

13:29:02 11   the comptroller can put into enforcing the SOB statute.

13:29:11 12   A.   That would be up to the comptroller how much

13:29:13 13   resources they put in.   I've met several officers.   They

13:29:16 14   simply come in two or three at a time.   Met some officers.

13:29:20 15   I don't know how many there were or are.

13:29:23 16   Q.   Just to clarify, you don't know how many enforcement

13:29:26 17   officers are at the Comptroller's Office?

13:29:28 18   A.   I do not.

13:29:29 19   Q.   No further questions.

13:29:39 20        MR. WALLACE:   Your Honor, I do not have any

13:29:44 21   redirect.   And at this time, the plaintiff would rest.

13:29:51 22        MS. HARGIS:   Defense rests, as well.

13:29:52 23        THE COURT:   Okay.   Well, there's no rebuttal

13:29:57 24   because they didn't put a case on.   Here's what I think we

13:30:04 25   should do.   I don't really need oral argument in terms of

13:30:08  1   closing argument.  That's -- I don't do that in my

13:30:13  2   non-jury cases.  You may be aware of that.  You may not.

13:30:17  3   But I don't ever have oral argument for closing argument.

13:30:22  4   And, of course, jury cases, we do.  But not non-jury

13:30:26  5   cases.  It isn't helpful.

13:30:27  6          What I do have, however, is counsel submit

13:30:31  7   written closing arguments where they address the issues

13:30:38  8   before the Court and point directly to the evidence which

13:30:42  9   they believe supports their position.  And you can address

13:30:48  10  the evidence which -- well, of course, the state didn't

13:30:55  11  put on any direct evidence, but you could certainly

13:30:59  12  address the positions that the state has taken in the

13:31:03  13  closing argument.  And you can, of course, address

13:31:06  14  plaintiff's case.

13:31:07  15         The closing argument should not be more than 25

13:31:16  16  pages, and it will be submitted simultaneously.  We're not

13:31:20  17  going to be going back and forth, okay?  You know what the

13:31:22  18  issues are.  There's no need.  There's going to be no

13:31:25  19  surprises here.

13:31:27  20         How much time do you think you need to submit

13:31:31  21  that?  I don't want to drag it out.

13:31:35  22         MS. HARGIS:  Is that something that we get the

13:31:37  23  reporter's record on beforehand or?

13:31:39  24         THE COURT:  Well, I mean, if you really think you

13:31:42  25  need it, then you can certainly order a transcript.  I

| | |
|---|---|
| 13:31:44 | 1 | mean, this has not been a long proceeding.  So would you |
| 13:31:55 | 2 | like to wait for the transcript? |
| 13:31:57 | 3 | MS. HARGIS:  Yes, please. |
| 13:31:57 | 4 | THE COURT:  All right.  And how long do you think |
| 13:32:00 | 5 | after you -- so let's say that she's going to take a week |
| 13:32:03 | 6 | and a half, I'll give her eight days, okay, to get the |
| 13:32:07 | 7 | transcript out.  And how long after that would it take |
| 13:32:13 | 8 | you?  I mean, I think you could start working on it before |
| 13:32:15 | 9 | the -- you got the transcript.  I mean, you were all |
| 13:32:17 | 10 | sitting here.  Not a surprise. |
| 13:32:21 | 11 | MS. HARGIS:  Couple of weeks. |
| 13:32:22 | 12 | THE COURT:  Okay.  I think that's fair.  I'll do |
| 13:32:25 | 13 | that.  So let's put this out about. |
| 13:32:34 | 14 | THE CLERK:  Thirty days. |
| 13:32:36 | 15 | THE COURT:  Let's give them a month.  So let's |
| 13:32:38 | 16 | put it out a month from today. |
| 13:32:41 | 17 | THE CLERK:  Friday, November 22nd. |
| 13:32:44 | 18 | THE COURT:  Okay. |
| 13:32:46 | 19 | MR. ALLEN:  The day after Thanksgiving. |
| 13:32:49 | 20 | MS. HARGIS:  No.  Thanksgiving's the week after. |
| 13:32:52 | 21 | MR. ALLEN:  Okay.  Great. |
| 13:32:54 | 22 | THE COURT:  Why?  Were you going to give me a |
| 13:32:55 | 23 | turkey at the same time you -- I don't want a turkey in |
| 13:32:59 | 24 | the form of a closing argument. |
| 13:33:01 | 25 | All right.  Is that satisfactory? |

13:33:03  1          MS. HARGIS:  Yes, sir.

13:33:05  2          MR. ALLEN:  It is.

13:33:06  3          THE COURT:  Yeah, I've had three -- you know,

13:33:09  4    rarely do we get -- you could be seated.  Thank you.

13:33:15  5    Rarely do we get a host of non-jury trials, but I had a

13:33:18  6    major case involving multiple murders on Fort Hood.  That

13:33:24  7    case was tried here without a jury, and we're waiting on

13:33:29  8    that -- those closing arguments to be submitted.  I just

13:33:32  9    did another one, and we're waiting for those closing

13:33:36  10   arguments.  And now, I'll be waiting for these closing

13:33:39  11   arguments.

13:33:41  12          I actually had them waive a jury in a criminal

13:33:47  13   case, and so, we rarely see that.  And so, I'm going to be

13:33:52  14   having to decide that case.  But I'm giving them an

13:33:54  15   opportunity in that one, as well, to submit their closing

13:33:58  16   argument in writing.  So I've got a lot of stuff to get

13:34:02  17   out.

13:34:05  18          But it shouldn't take too long beyond the, let's

13:34:08  19   say -- we'll certainly get your decision out before the

13:34:13  20   end of the year.  Even though I'm going to have two others

13:34:18  21   that I have to get out at the same time.  It's much easier

13:34:22  22   for a judge, I can promise you, to have a jury.  Way

13:34:26  23   easier.  All you do is work on the jury instructions and

13:34:35  24   preside over the trial, and when the jury reaches a

13:34:37  25   verdict, you know, you might have to deal with some

13:34:39  1   posttrial motions, but it's nothing like this.

13:34:44  2              All right.  So are we done now?  Anything else

13:34:48  3   you'd like to put on the record?

13:34:51  4              MS. HARGIS:  I believe we're done.

13:34:53  5              MR. WALLACE:  Have we addressed the exhibits?

13:34:55  6              THE COURT:  Have you got all the exhibits in?

13:34:58  7              MR. WALLACE:  We're --

13:35:01  8              MR. ALLEN:  We're fine with the list that

13:35:02  9   Priscilla submitted to us.  Are y'all good with it?

13:35:05  10             MS. HARGIS:  Yes.

13:35:06  11             MR. ALLEN:  Okay.  Then we are.

13:35:07  12             THE COURT:  Okay.  We're all done with the

13:35:08  13   exhibits?

13:35:09  14             MR. ALLEN:  Yes.

13:35:10  15             THE COURT:  Okay.  All right.  Very good.  Then

13:35:13  16   this trial is in recess.

13:35:33  17             (End of proceedings.)

          18

          19

          20

          21

          22

          23

          24

          25

1                          * * * * * *

2

3

4   UNITED STATES DISTRICT COURT  )

5   WESTERN DISTRICT OF TEXAS)

6

7      I, LILY I. REZNIK, Certified Realtime Reporter,

8   Registered Merit Reporter, in my capacity as Official

9   Court Reporter of the United States District Court,

10  Western District of Texas, do certify that the foregoing

11  is a correct transcript from the record of proceedings in

12  the above-entitled matter.

13     I certify that the transcript fees and format comply

14  with those prescribed by the Court and Judicial Conference

15  of the United States.

16     WITNESS MY OFFICIAL HAND this the 20th day of February,

17  2020.

18

19

20                         /s/Lily I. Reznik
                           LILY I. REZNIK, CRR, RMR
21                         Official Court Reporter
                           United States District Court
22                         Austin Division
                           501 W. 5th Street,
23                         Suite 4153
                           Austin, Texas 78701
24                         (512)391-8792
                           Certification No. 4481
13:35:33  25               Expires:  1-31-21
13:35:33